DONALD L. HUBBARD, Plaintiff-Appellee, v. BLANCHE V. LOGSDON, Indiv. and as Ex'r of the Estate of Elmer Logsdon, Deceased, *et al.*, Defendants-Appellants.

Fourth District   No. 14488

Opinion filed January 6, 1978.—Rehearing denied February 15, 1978.

Barry Chafetz and Charles H. Delano, both of Delano Law Offices, P.C., and Robert Weiner, both of Springfield, for appellants.

Heyl, Royster, Voelker & Allen, of Peoria (Rex K. Linder and Charles W. Pautsch, of counsel), for appellee.

Mr. JUSTICE ALLOY delivered the opinion of the court:

This is an appeal from a judgment of the Circuit Court of Cass County, following a jury verdict, which assessed damages in the amount of $100,000 against the estate of Blanche Logsdon, and $35,000 against the estate of Elmer Logsdon.

Plaintiff Donald L. Hubbard instituted the action in this cause to recover from the estate of Elmer Logsdon, damages occasioned by breach of an oral contract by Elmer Logsdon in failing to obtain or assist plaintiff in obtaining the signature of Elmer Dale Logsdon (decedent's son) to a written noncompetition agreement, and, also, to recover from the estate of Blanche V. Logsdon damages occasioned by the breach of an oral contract by Blanche V. Logsdon by the reason of her re-entry into competition with plaintiff in the tug service business. As we have noted in the jury trial in this cause, the verdict was rendered in favor of plaintiff against the estate of Elmer Logsdon in the sum of $35,000 and, also, in favor of plaintiff as against the estate of Blanche V. Logsdon in the sum of $100,000.

On appeal in this court, defendants contend (1) that the enforcement of the oral agreement is barred (a) by the statute of frauds, (b) because the noncompetition agreement constituted an unreasonable restraint of trade, and (c) by the doctrine of mutuality of obligation; (2) that the trial court

erred in denying defendants' post-trial motion based on the sufficiency of the evidence to support the jury's finding of liability; (3) that the jury's verdicts are excessive; (4) that the trial court erred in excluding and admitting certain testimony; (5) that defendants were denied their right to a fair and impartial trial by jury; (6) that the trial court abused its discretion in allowing plaintiff leave to amend his complaint; and (7) that the trial court improperly instructed the jury.

Plaintiff filed his complaint on February 20, 1975, and amended the complaint on July 21, 1975, alleging that during January of 1974, Elmer Logsdon, Blanche Logsdon, and Elmer Dale Logsdon were the owners and operators of a certain harbor and fleeting business upon the Illinois River in the vicinity of Beardstown, Cass County, Illinois, and that during January of 1974, Elmer Logsdon, Blanche Logsdon and Elmer Dale Logsdon desired to terminate their involvement in the business by March of 1974. The amended complaint also alleged that in January of 1974, the Logsdons solicited plaintiff to purchase the harbor and fleeting business, and that in February of 1974, Elmer Logsdon, Blanche Logsdon and Elmer Dale Logsdon orally contracted and agreed to sell the business to plaintiff for the sum of $9,000 plus interest, payable in 120 equal monthly installments. The complaint also alleged that plaintiff agreed that he would not fleet any barges adjacent to property located on the Beardstown side of the Illinois River and owned by either Elmer Logsdon or Blanche Logsdon without first obtaining written permission from them, and that he also agreed that he would not use the name "Logsdon" in connection with the operation of his fleeting business. The complaint also alleged that all three of the Logsdons agreed that they would refrain for a period of 10 years from participating in the harbor and fleeting business upon the Illinois River in the vicinity of Beardstown.

The amended complaint, as amended by leave of court on September 16, 1976, alleged that during the last week of February or the first week of March 1974, plaintiff and defendants orally modified the payment provisions of the contract by providing that the plaintiff could pay the purchase price when he got "on his feet," so long as the defendants receive $12,000 at the end of 10 years. Plaintiff alleged in the amended complaint that, in reliance upon the oral contract, plaintiff sold his home in Peoria, Illinois, and moved his family to Beardstown, Illinois, where he purchased a tugboat, entered into leases with owners of certain realty adjoining the Illinois River to use their banks and shore for the docking of boats and barges and began operating a business known as the "Beardstown Harbor and Fleeting Service" in the vicinity of Beardstown on March 7, 1974. Count I of the amended complaint alleged that on or about September 25, 1974, Blanche Logsdon and Elmer Dale Logsdon, in violation of the non-competition covenant, entered into the harbor and

fleeting business upon the Illinois River under the name "Logsdon Tug Service", and that they solicited customers of plaintiff within the vicinity of Beardstown. Plaintiff alleged that as a result thereof, plaintiff's harbor and fleeting business lost business to the Logsdon Tug Service. Count III of the amended complaint also alleged that during February of 1974, Elmer Logsdon orally agreed, as a part of the sale transaction, that he would obtain a written noncompetition agreement from Blanche Logsdon and Elmer Dale Logsdon that they would not become involved in the harbor and fleeting business upon the Illinois River in the vicinity of Beardstown for a period of ten years. He alleged that Elmer Logsdon failed to perform such obligation, that Blanche Logsdon and Elmer Dale Logsdon re-entered the harbor and fleeting business in September of 1975, and as a result of which plaintiff's harbor and fleeting business had lost business to the Logsdon Tug Service.

It appears from the record that both Elmer Logsdon and Blanche Logsdon died prior to the beginning of the trial. Evidence at the trial established that Elmer and Blanche Logsdon were the owners and operators of the Logsdon Tug Service and the Logsdon River Construction business, and that early in 1974, by reason of Elmer Logsdon's ill health, both Elmer and Blanche Logsdon attempted to divest themselves of the tug service business in the Beardstown area. In January of 1974, plaintiff became aware that the Logsdons desired to terminate their activity in the tug service business and in January or February of 1974, plaintiff first met with the Logsdons to discuss his taking over the tug service business on the Illinois River in the Beardstown area. In February of 1974, the Logsdons and plaintiff reached an oral understanding whereby the Logsdons would withdraw from the tug service business in the Beardstown area and plaintiff would replace them as the sole tug service on the Illinois River in the Beardstown area. Pursuant to this oral agreement, plaintiff could not use the Logsdon name, was required to obtain his own equipment, could not tie onto Logsdon property without permission of the Logsdons, and would pay the Logsdons a purchase price of $12,000 in 120 equal monthly installments.

It also appears from the record that on February 21, 1974, the Logsdons and plaintiff met at the office of Milton McClure, who was acting as the attorney for both the Logsdons and plaintiff, for the purpose of reducing the oral understanding to a written contract. McClure testified that prior to the meeting in his office, the parties had agreed to the sale of the business, and also agreed that plaintiff would have the exclusive right to harbor and fleet tows in the Beardstown area. The attorney testified, also, that neither the Logsdons nor any member of their family would compete with plaintiff for 10 years. McClure also testified that Elmer Logsdon committed himself to having his son join in the noncompetition

agreement. The attorney also stated that, in preparing the written contract, he was acting purely as a scrivener and was preparing a written memorandum of what the parties had already agreed to. He prepared a written agreement, including an agreement not to compete, but that instrument was never executed. Following the meeting with McClure, Elmer Logsdon told his son, Elmer Dale Logsdon, that he (Elmer Dale Logsdon) was a party to the agreement and would be required to sign the noncompetition agreement. The written agreement, as prepared by McClure, stated that Elmer Logsdon would assist plaintiff in obtaining the signatures of Blanche Logsdon and Elmer Dale Logsdon to the noncompetition agreement.

It was also apparent from testimony at the trial that in March of 1974, a meeting was held at the Logsdons' home between the Logsdons, plaintiff and Michael Barnett, plaintiff's accountant, for the purpose of explaining the Logsdons' method of accounting. There was testimony at the trial, that conversation at the meeting included mention of a contract between the Logsdons and plaintiff, and that Elmer Logsdon stated that he was not concerned when payments by plaintiff under the contract began, so long as he received $12,000 by the end of 10 years. Additional testimony at the trial, established that Elmer Logsdon informed three grain elevator operators, a farmer who leased fleeting area to Logsdon, and an oil dealer, that plaintiff would be taking over the fleeting service in the Beardstown area.

Pursuant to the oral agreement, plaintiff was to commence service on March 1, 1974, and the Logsdons were to withdraw from service on that date. Plaintiff commenced service in the Beardstown area on March 7, 1974, and was the only tug service business on the Illinois River in the Beardstown area from March 7, 1974, through September 24, 1974.

Following the meeting with McClure, it appears that the Logsdons refused to sign the written agreement, and plaintiff informed McClure and Elmer Dale Logsdon that he would not make any payments under the contract until the Logsdons signed the written agreement.

On September 25, 1975, Elmer Dale Logsdon commenced operations as a fleeting and tug service on the Illinois River near Beardstown, as we have indicated, under the name of Logsdon Tug Service. While the business was nominally owned by Elmer Dale Logsdon, Blanche Logsdon loaned $10,000 to him to start the business, leased to Elmer Dale Logsdon the boats and equipment used by the business, operated the radio with respect to the business, and did bookwork for the business. Subsequent to the filing of the instant action, Elmer Dale Logsdon paid $6,000 rental on the equipment leased from Blanche Logsdon.

The record also shows that the gross income from plaintiff's business for the period from March 7 through December 31, 1974, was $92,413.58, with

a net income of $71,384.70. The Logsdon Tug Service had gross receipts in 1974 (from September 25 to the end of the year) of $10,510, with a net loss of $7,845. For the year 1975, however, the gross income of the Logsdon Tug Service was $135,114.43, with a net profit of $2,010.91. There was evidence showing that plaintiff became heavily involved financially in proceeding to take over the fleeting and tug business in reliance on the Logsdons' agreement. There was evidence that plaintiff Hubbard, at the time of trial, was indebted in the sum of $243,000 in establishing the business under the agreement.

Following return of the verdict in this cause, the court denied defendants' motion for judgment notwithstanding verdict and for a new trial, and the court entered judgment on the jury's verdicts.

■■ Defendants first argue that the enforcement of the oral contract is barred by the Statute of Frauds. Section 1 of "An act to revise the law in relation to frauds and perjuries" (Ill. Rev. Stat. 1975, ch. 59, par. 1) provides in part:

> "That no action shall be brought ° ° ° upon any agreement that is not to be performed within the space of one year from the making thereof, unless the promise or agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith ° ° ° ."

In the instant case, plaintiff's evidence established an oral agreement by the Logsdons not to compete with plaintiff's tug service for a period of 10 years. We note that the Illinois Appellate Court has stated in *Osgood v. Skinner* (1st Dist. 1904), 111 Ill. App. 606, 617-18:

> "So far as the Statute of Frauds is concerned, it does not avoid the parol agreement, notwithstanding the same was to remain in force for longer than one year. Where the agreement by some contingency such as death or otherwise is capable of being fully performed within a year and is not simply terminated by the death of the party, it is not within the statute. (Citations omitted.) If appellees had died during the first year, their agreement not to compete with appellant would have been completely performed."

(See also *Decker v. West* (2d Dist. 1934), 273 Ill. App. 532.) The oral agreement, therefore, is not rendered unenforceable by reason of the fact that the personal undertaking in the agreement not to compete extended for a period of 10 years. It is further noted that while the agreement between the parties initially called for payments by plaintiff over a 10-year period, Elmer Logsdon later stated that plaintiff could begin making payments whenever plaintiff "got on his feet," so long as Logsdon received $12,000 by the end of 10 years. It is thus apparent that plaintiff

could have paid Logsdon the entire sum within the period specified of one year and that the payment provision does not, consequently, render the agreement unenforceable. We conclude that the trial court properly determined that enforcement of the oral agreement was not barred by the Statute of Frauds.

Defendants also argue that the oral agreement is unenforceable because the noncompetition provision constitutes an unreasonable restraint of trade. The proof offered by plaintiff at the trial indicated that Elmer Logsdon and Blanche Logsdon agreed, as part of the understanding in connection with the sale, that they would not enter into the fleeting and tug business in the Beardstown vicinity, in competition with plaintiff, for a period of 10 years and Elmer Logsdon committed himself to securing his son's agreement to the same provision.

■■■ As stated in *Pelc v. Kulentis* (2d Dist. 1930), 257 Ill. App. 213, 216-17:

> "* * * the general rule now is, that contracts in unreasonable restraint of trade are void, while contracts which impose a reasonable restraint upon trade are valid. Considered with reference to the situation, business and objects of the parties, and in the light of all the surrounding circumstances with reference to which the contract was made, if the restraint contracted for appears to have been for a just and honest purpose, for the protection of the legitimate interests of the party in whose favor it is imposed, reasonable as between them, and not injurious to the public, the restraint will be held valid. The test applied to the question of reasonableness is whether the restraint is such only as to afford a fair protection to the interests of the party in whose favor it is given, and not so large as to interfere with the interests of the public. The result of the test must be determined from a practical consideration of the circumstances of each case, and the law seems to be well settled that the covenant embodying the restriction must be merely ancillary to the main purpose of a lawful contract, necessary to protect the covenantee in the enjoyment of the legitimate fruits of the contract, or to protect him from the dangers of an unjust use of those fruits by the other party."

As also noted in *McCook Window Co. v. Hardwood Door Corp.* (1st Dist. 1964), 52 Ill. App. 2d 278, 286, 202 N.E.2d 36:

> "The enforceability of a restraint ancillary to the sale of a business or property depends on the reasonableness of the restraint as to time and as to the extent of the territory; neither one is conclusive but both are important factors in the determination of the reasonableness of the restraint."

In the instant case, the Logsdons agreed to sell their fleeting and tug

service business to plaintiff, and while the sale did not include the sale of any tangible equipment, it appears that the Logsdons did introduce plaintiff to clients of their business as being the successor to the business. There was testimony in the record that Elmer Logsdon stated to McClure that the vicinity of Beardstown would support only one fleeting and tug service. The oral agreement as to noncompetition was limited to the vicinity of Beardstown and to a period of 10 years. Under the circumstances of this particular case, we conclude that the noncompetition agreement was for a fair and honest purpose, given to afford fair protection to the efforts of plaintiff in conducting his fleeting and tug service, and that such oral covenant was not void as an unreasonable restraint on trade.

■■ Defendants also contend that the oral agreement was unenforceable due to lack of mutuality, inasmuch as plaintiff was only obligated to make payments under the contract "as soon as he got on his feet." It is well established that mutuality of obligation must exist for an agreement to be enforceable. (*Weaver v. Weaver* (1883), 109 Ill. 225.) It has been held that a promise to make payment "as soon as possible" is not too indefinite to support recovery based on contract. (*Pinney v. Smith* (1st Dist. 1907), 136 Ill. App. 129.) In this case, we believe that the term allowing payment "as soon as he got on his feet" is sufficiently objectively determinable as to establish an obligation of payment. We also note that under the oral agreement, even though payment was not to start until plaintiff "got on his feet," the payment was to be complete by the end of 10 years, and that mutuality of obligation is present under the provisions of this agreement.

■■■ A further contention is made by defendant that the trial court erred in denying their post-trial motion for a new trial or for judgment notwithstanding the verdict, on the grounds that there was insufficient evidence for the jury to conclude that the parties entered into an oral agreement; that plaintiff did not breach the oral agreement; the defendants did breach the oral agreement; and that plaintiff suffered damage as a result of defendants' breach of the agreement. The language of the court in *Mizowek v. De Franco* (1976), 64 Ill. 2d 303, 310, 356 N.E.2d 32, is pertinent, where it says:

> "The standards relating to the direction of verdicts and to the granting of new trials are of course different. In *Pedrick* this court declared: 'We have rather carefully preserved the distinction between the evidentiary situation which will require a new trial [citation], and that justifying direction of a verdict or judgment *n.o.v.* There is, in our judgment, excellent reason for so differentiating to be found in the radically different results of allowance of the two motions, and we believe a more nearly

conclusive evidentiary situation ought to be required before a verdict is directed than is necessary to justify a new trial.' [Citation.] On a motion for a new trial a court will weigh the evidence and set aside the verdict and order a new trial if the verdict is contrary to the manifest weight of the evidence. [Citations.]"

There was testimony at the trial from several witnesses, including the Logsdons' and plaintiff's attorney, plaintiff's accountant, several of the Logsdons' customers, and others, that an agreement did exist between the Logsdons and the plaintiff. There was evidence that Elmer Dale Logsdon did not sign the noncompetition agreement, and that Blanche Logsdon was involved in the tug business nominally started by her son. There was also testimony that the Logsdon Tug Service provided services in the Beardstown vicinity, and that such vicinity would support only one tug service. After a review of the evidence, it is apparent from the record, that the jury's findings on these factual issues were not against the manifest weight of the evidence, and that the trial court properly denied defendants' post-trial motion.

■■ A further argument is made by defendants that the jury verdicts are excessive. The jury returned verdicts of $35,000 against the estate of Elmer Logsdon and $100,000 against the estate of Blanche Logsdon, which represented the lost profits of plaintiff for a 10-year period as a result of Elmer Logsdon's failure to obtain the signature of Elmer Dale Logsdon to the noncompetition agreement, and as a result of the fact that Blanche Logsdon re-entered the fleeting and tug business in the Beardstown area. The Supreme Court of this State, in *Schatz v. Abbott Laboratories, Inc.* (1972), 51 Ill. 2d 143, 147-148, 281 N.E.2d 323, quoting *Barnett v. Caldwell Furniture Co.* (1917), 277 Ill. 286, 289, said:

"It is perhaps true that absolute certainty as to the amount of loss or damage in such cases [involving lost profits] is unattainable, but that is not required to justify a recovery. All the law requires is that it be approximated by competent proof. That proof of the exact amount of loss is impossible will not justify refusing compensation. If that were the law, contracts of the kind here involved could be violated with impunity. All the law requires in cases of this character is that the evidence shall with a fair degree of probability tend to establish a basis for the assessment of damages."

In the instant case, plaintiff introduced evidence that the gross income of his business from March 7 through December 31, 1974, was $92,413.58, with a net income of $71,384.70. Additional evidence indicated that the gross income of the Logsdon Tug Service (started in September 1974), was $10,510 in 1974 and $135,114.43 in 1975, with a net loss in 1974 of $7,845

and a net income of $2,010.91 in 1975. Additional testimony indicated that Elmer Logsdon believed that the Beardstown vicinity could support only one fleeting and tug service. We find the jury's verdicts were within the range of the evidence of the plaintiff's lost profits over a 10-year period. In support of this position, in *Werner's Furniture, Inc. v. Commercial Union Insurance Co.* (1st Dist. 1976), 39 Ill. App. 3d 59, 70, 349 N.E.2d 616, the appellate court said:

> "It has been held repeatedly that the ascertainment and assessment of damages is a question of fact which is peculiarly within the province of the jury and, where there is no issue raised concerning the instructions on damages and no showing that the size of the verdict was the result of passion or prejudice or a patent disregard of any element of damages, the determination by the jury will be affirmed."

We conclude that the jury's verdicts, being within the range of the evidence and not the result of palpable passion or prejudice, were not excessive.

■■■ A further contention by defendant is that the trial court erred in admitting and excluding the testimony of certain witnesses. Plaintiff moved *in limine* to prevent defendants from introducing evidence of a bankruptcy taken by plaintiff prior to formation of the oral agreement in the instant case, and evidence of the conviction of Larry Moore (a plaintiff's witness to a staged tender of payment by plaintiff) for the offense of burglary in 1960, and the court granted the motion. We note that defendants did not present this issue in their post-trial motion and that, therefore, the issue has been waived. (Ill. Rev. Stat. 1975, ch. 110A, par. 366(b)(2)(iii).) We note, however, that plaintiff's prior bankruptcy had not been shown to be relevant to any defense of defendants at the time of the motion *in limine*, and that, therefore, the trial court did not err in denying the motion with respect to the bankruptcy evidence. We also note that the conviction of Moore was distant in time, so that the trial court could have reasonably concluded that the probative value of the evidence of the conviction was outweighed by the possibility of prejudice to the plaintiff.

■■ Defendants also contend that the trial court erred in admitting testimony from Milton McClure, John White, and Michael Barnett, on the ground that testimony from such witnesses was barred by the Dead Man's Act (Ill. Rev. Stat. 1975, ch. 51, par. 2). It appears that McClure is a member of the board of directors of the First National Bank of Beardstown; that White is president of the First National Bank of Beardstown; and that the bank had loaned money to plaintiff and actually owned and leased to plaintiff a tug boat used in the business. It also

appears that Barnett is employed as plaintiff's accountant. A parallel issue was considered in *In re Estate of Truman* (2d Dist. 1975), 32 Ill. App. 3d 886, 888, 336 N.E.2d 766, where the court stated:

"The interest which renders a witness incompetent must be such that pecunairy gain or loss will come to the witness as the immediate result of the decree. (*Britt v. Darnell*, 315 Ill. 385, 392 (1925); *In re Estate of Fordyce*, 130 Ill. App. 2d 755, 756-57 (1971).)

'The interest sought to be shown here falls short of such a standard. The fact that as a result * * * [of his testimony] his chances might be better of enjoying continued employment * * * shows at best only a remote and indirect interest.' *In re Estate of Wolfner*, 27 Ill. 2d 221, 224 (1963)."

We conclude that the interests of the witnessess here complained of, as director and employee of the bank and as employee of plaintiff, were too indirect to render the witnesses incompetent to testify under the Dead Man's Act, and that the trial court properly allowed testimony of these witnesses.

Defendants argue that they were denied their right to a fair and impartial jury. It appears that the jury was selected in the instant case on September 13, 1976, and that opening arguments were given on that date. In conducting the voir dire, the trial court questioned the prospective jurors, with the court's own questions and questions posed by the parties. The attorneys were not permitted to directly question the prospective jurors. Prior to examination of the first witness on September 14, 1976, counsel for the defendants brought to the court's attention that one of the jurors was married to a possible plaintiff's witness, who had observed a staged tender of payment by plaintiff. It appears that this fact was not discovered earlier due to the misspelling of the witness' name in an interrogatory. At the time the matter was first brought to the trial court's attention, the court noted that the parties had stipulated to proceeding with 11 jurors (instead of selecting an alternate juror), and that there was no indication that the juror knew anything of the transaction which was the subject of the instant action, and that should problems later arise, the juror could be dismissed and the cause tried with 11 jurors. Subsequently, plaintiff's counsel examined a witness (other than the juror's husband) with regard to the tender, without mention of the juror's husband by name. Defense counsel then objected that he could not effectively cross-examine the witness without involving the juror's husband by name, and the trial court thereupon dismissed the juror.

■■ ■ Defendants contend that the trial court erred in not asking prospective jurors certain questions proposed by defense counsel, and by not allowing defense counsel to question prospective jurors directly. We

have examined defendants' allegations and conclude that the trial court did not abuse its discretion in conduct of the voir dire as allowed under Supreme Court Rule 234 (Ill. Rev. Stat. 1975, ch. 110A, par. 234). Defendants further argue that the trial court erred in dismissing the juror and proceeding to try the cause with a jury of 11. We note that the parties had stipulated to a jury of 11. Defendants argue, however, that the dismissal of the juror for cause in the fourth day of the trial had a prejudicial effect upon the remaining jurors. The appellate court in *Fitzsimons v. National Tea Co.* (2d Dist. 1961), 29 Ill. App. 2d 306, 322, 173 N.E.2d 534, discussed this issue by saying:

> "The matter of withdrawing a juror and declaring a mistrial, or not doing so, rests in the sound judicial discretion of the Court and ordinarily, unless there is some great abuse of the discretion, its exercise, one way or the other, is not reversible error [citation]."

The trial judge in the instant case was in a better position to assess the impact on the jury of the dismissal of one of the jury panel, and defendants have not demonstrated on this appeal that the trial court erred or abused its discretion in making its determination. We conclude that the trial court properly dismissed the juror whose presence was objected to by defendants, and properly tried the cause with a jury of 11 pursuant to the stipulation of the parties.

Defendants argue that the trial court abused its discretion in allowing plaintiff to amend his complaint at the trial. Plaintiff's amended complaint, as filed on July 21, 1975, alleged that the oral agreement had been modified to allow payment by plaintiff in 10 equal annual installments, and after all testimony was received at the trial, the trial court allowed plaintiff leave to amend his complaint to allege that the agreement had been modified so that plaintiff could commence payments "as soon as he got on his feet," so long as the Logsdons received $12,000 by the end of 10 years. We note that this issue was not raised in defendants' post-trial motion, and is therefore waived (Ill. Rev. Stat. 1975, ch. 110A, par. 366(b)(2)(iii)). Section 46(3) of the Civil Practice Act (Ill. Rev. Stat. 1975, ch. 110, par. 46(3)) provides:

> "A pleading may be amended at any time, before or after judgment, to conform the pleadings to the proofs, upon terms as to costs and continuance that may be just."

The court in *Uscian v. Blacconeri* (1st Dist. 1975), 35 Ill. App. 3d 80, 84, 340 N.E.2d 618, recited the appropriate rule that:

> "The decision as to whether to allow an amendment to the pleadings rests in the sound discretion of the trial judge and, absent an abuse of discretion, his decision will not be disturbed on review."

We, therefore, conclude that there is no evidence that the trial court

abused his discretion in allowing plaintiff to amend his complaint to conform to the proofs at the trial.

A final argument is made by the defendants that the trial court erroneously instructed the jury. The post-trial motion filed by defendants alleged that: "The court erred in accepting plaintiff's jury instructions objected to by the defendants and denying instructions submitted by the defendants." As stated in *Sny Island Levee Drainage District v. Meyer* (1963), 27 Ill. 2d 530, 537-38, 190 N.E.2d 356:

> "Defendants made a general objection in their post-trial motion to 'every instruction that was tendered by the objectors and refused by the court'. The motion should specify the grounds why the refusal (or giving) of the instruction was error, if the party fails to do so he waives the right of review. [Citation.] Accordingly, we do not reach the question of whether the refusal of the tendered instruction was error."

Nonetheless, as stated in *Lau v. West Towns Bus Co.* (1959), 16 Ill. 2d 442, 452, 158 N.E.2d 63:

> "We have examined the instructions given by the court, and believe the jury was fully and accurately instructed concerning both the defendant's and plaintiff's theory of the case. The instructions offered by defendant and refused by the court were either misleading, or completely covered by other instructions. Where several instructions embodying the same legal principle are submitted to the court, it may select the one it sees fit and need not repeat the same proposition of law in different language in separate instructions. [Citation.] Upon considering the instructions as a series, we find no prejudicial error in the manner in which the court instructed the jury."

While we determine that the instruction issue was waived, we also observe in this case, that the court, in instructing the jury, adequately presented the issues and the applicable law, and instructions considered as a whole, did not mislead the jury nor were the defendants' rights prejudiced so as to justify reversal on the ground contended for by defendants.

For the reasons stated, therefore, the judgment of the Circuit Court of Cass County is affirmed.

Affirmed.

STENGEL, P. J., and BARRY, J., concur.