TOWER OIL & TECHNOLOGY CO., INC., Plaintiff-Appellee and Cross-Appellant, *v.* RICHARD BUCKLEY *et al.*, Defendants-Appellants and Cross-Appellees.

First District (3rd Division)    No. 79-784

Opinion filed August 12, 1981.

Edmund B. Moran, Jr., of Keck, Mahin & Cate, and George E. Bullwinkel, both of Chicago, for appellants.

David B. Kahn and Glen A. Neuman, both of Chicago, for appellee.

Miss JUSTICE McGILLICUDDY delivered the opinion of the court:

The plaintiff, Tower Oil & Technology Co., Inc. (Tower), brought this action for damages against its former employee, Richard Buckley, for breach of a restrictive covenant contained in his employment contract. This action was also against Tri-State Industrial Lubricants, Inc. (Tri-State), Buckley's new employer, and Brian Davies, Tri-State's general manager and principal shareholder, for inducement and conspiracy in connection with the alleged breach. Counts of the complaint alleging breach of an agreement prohibiting trade secret disclosure and unfair competition were subsequently dismissed with prejudice on the motion of Tower.

Tower and the defendants filed opposing motions for summary judgment. In ruling on the motions, the trial court held that although there were disputed issues of fact concerning Tower's damage claim for breach of the covenant, the covenant itself was valid and enforceable. The court also rejected the defendants' affirmative defense of laches and granted summary judgment in favor of Tower on the defendants' counterclaim for violation of the Illinois Antitrust Act.

The case proceeded to trial before a jury, which returned a verdict of $14,700 in compensatory damages against all defendants and $53,200 in punitive damages against Tri-State and Davies. The defendants appeal and the plaintiff cross-appeals.

The affidavits for summary judgment and the depositions and documents filed in support thereof reveal the following undisputed facts.

Buckley was employed in 1961 by Tower as an industrial lubricant salesman. As a condition of his employment, Buckley was required to execute an agreement which provided, in pertinent part, that:

"In the event of termination of my association with the Tower Oil Company for any reason, I shall not directly or indirectly solicit, contact or otherwise engage in the sale of like or similar products to any Tower Oil Company customers or prospects as shown by its records, for three (3) years thereafter, * * *."

Buckley voluntarily left his position at Tower on June 30, 1971. He worked for approximately four weeks as an industrial chemical salesman. On August 1, 1971, Buckley became a lubricant salesman for Tri-State under the supervision of Davies, who was recovering from a serious accident.

Buckley subsequently contacted and sold lubricants to five customers of Tower. In May of 1972 Tower's attorneys notified Buckley and Tri-State that Buckley was in direct violation of the covenant. Harry Simon,

Tower's vice president, spoke to Buckley who assured Simon that he would not solicit Tower's customers. Buckley admitted in his deposition that although he and Davies discussed Tower's threat of legal action, they did not take it too seriously because they had little involvement at that time with Tower's customers. Tower subsequently discovered that Buckley had violated his promise. Tower filed its complaint in February of 1974.

Buckley admitted in his deposition that he possessed little knowledge of the lubricant industry when he was hired by Tower. During his training he learned how to solve the lubrication problems of his customers. At company meetings held twice a month, salesmen exchanged ideas concerning the servicing of their customers and discussed new products and their proper application.

In his affidavit, George Spehn, president of a competing company, stated that there were approximately 50,000 lubricant customers in the Chicago area. He asserted that customers in the industry are extremely stable.

Al Simon, Jr., Tower's president, asserted in his affidavit, that at the time Buckley left his position at Tower, Tower had less than 1200 customers and prospects.

Affidavits of several lubricant customers revealed that because of the expense and inconvenience of testing lubricants, it is very difficult for a competitor to acquire new business from a company which has a satisfactory supplier.

The affidavits of the five customers involved in this litigation explained that one of the reasons they replaced Tower products with Tri-State products was because they were less expensive.

After the trial court's rulings on the motions for summary judgment, this matter proceeded to trial at which Tower attempted to prove that it lost the business of the five customers as a result of Buckley's solicitation and sales during the covenant period.

Tower presented three letters to the customers sent by Tri-State over Buckley's signature, in which he solicited their business. In addition, Tower offered into evidence Tri-State's invoices to the five customers during the covenant period. On most of the invoices, Buckley's initials appeared in a box reserved for the name of the salesman.

Al Simon, Jr., Tower's president, testified concerning Tower's loss of business. He calculated the average annual sales for each of the five customers prior to Buckley's alleged breach of covenant. Simon multiplied this figure by the number of years Tower was without the particular customer's business during the covenant period. Simon computed total lost sales in the amount of $36,800 and testified that 40% of this amount ($14,720) was Tower's loss of profits during the covenant period.

Florence Meisner, Tri-State's secretary, was called as an adverse witness. She testified that she prepared Tri-State's invoices for its customers. Each invoice contained a box for the name of the salesman. Meisner stated that she did not always put the actual salesman's initials into the box. When asked if she had testified at her deposition that the initials indicated the person actually calling on the customer, she stated that if her deposition revealed that statement, she must have made it.

Brian Davies was also called as an adverse witness. Davies was questioned concerning Tri-State's failure to list Buckley as the salesman of products to the five customers in its answers to interrogatories. Davies testified that although Buckley often drove him to the offices of the customers, Buckley had nothing to do with initiating sales. Davies maintained that Buckley was a serviceman who would examine problems such as rusting, staining and delivery. Although Davies asserted that the five customers were Tri-State customers prior to the employment of Buckley, he admitted that Tri-State sold less than $5,000 in products to these customers in the three-year period prior to Buckley's association with Tri-State. During the three-year covenant period Tri-State's sales to the five customers exceeded $100,000.

Davies also admitted that he wrote a letter to the employer of George Spehn of Stuart Oil Company. Spehn had filed an affidavit on behalf of Tower in this matter. In the letter Davies threatened legal action against Stuart Oil Company if Spehn testified against Tri-State.

Richard Buckley also testified as an adverse witness. He stated that while employed by Tower, he sold lubricants to four of the five customers. He also admitted that at his deposition he stated that he was the salesman of Tri-State products to the five customers.

At this point the trial court excluded the expert testimony of Walter Bissell concerning the diminution in value of Tower's business at the end of the covenant period. In an offer of proof Bissell testified that the value of Tower's business was diminished by $5,000 for each $1,000 in lost sales (less direct costs) sustained by Tower.

Florence Meisner testified on behalf of the defendants that Tri-State's log books revealed that Tri-State sold products to the customers during the period of 1965-1971. She stated that after his employment, Buckley was the service representative on these accounts.

Brian Davies also testified that Buckley was the service representative to the five customers during the covenant period. He asserted that Buckley had nothing to do with the customer's decisions to purchase products from Tri-State.

Mike Brandson of Semrow Products testified that Semrow decided to purchase products from Tri-State because of its lucrative prices. He denied that Buckley influenced this decision. On cross-examination he

admitted that in 1973 Buckley solicited Semrow to purchase industrial lubricants and related products from Tri-State.

Bill LaFave of Aetna Bearing testified that he started purchasing products from Tri-State after a discussion with Davies. He stated that Buckley had nothing to do with this decision.

Richard Buckley testified that he did not solicit Tower's customers unless they were a companion customer of Tri-State.

The trial court excluded the testimony of the defendants' expert witness, Ray Larson. In an offer of proof Larson testified that customers in the industrial lubricant trade are likely to switch their business from one supplier to another at any time for any reason.

I

The defendants contend on appeal that the restrictive covenant was unreasonable and unenforceable per se. In the alternative, they argue that the issue of reasonableness should not have been decided in Tower's favor on a motion of summary judgment.

■■ Although post-employment restrictive covenants to some extent operate in restraint of trade, they also have a social utility in that they protect an employer from the unwarranted erosion of confidential information. (*Wessel Co. v. Busa* (1975), 28 Ill. App. 3d 686, 329 N.E.2d 414.) These covenants, therefore, will be enforced only if reasonable, and such a determination is a question of law. (*Barrington Trucking Co. v. Casey* (1969), 117 Ill. App. 2d 151, 253 N.E.2d 36.) In determining whether the covenant is reasonable, it is necessary to consider whether enforcement of the covenant will injure the public, whether enforcement will cause undue hardship to the promisor and whether the restraint imposed by the covenant is greater than is necessary to protect the interests of the employer. (*House of Vision, Inc. v. Hiyane* (1967), 37 Ill. 2d 32, 255 N.E.2d 21.) In addition, the time limitation and geographical scope of the covenant must also be reasonable. *Donald McElroy, Inc. v. Delaney* (1979), 72 Ill. App. 3d 285, 389 N.E.2d 1300; *Image Supplies, Inc. v. Hilmert* (1979), 71 Ill. App. 3d 710, 390 N.E.2d 68.

We first note that the covenant which prohibited Buckley from soliciting the business of Tower customers and prospects did not threaten any legitimate interests of the public. The affidavits reveal that over 30 companies provided industrial lubricants in the Chicago area. Thus, enforcement of the covenant would not have prevented the public from obtaining such lubricants from any of these companies, including Tri-State.

We disagree with the defendants' contention that enforcement of the covenant would have caused undue hardship to Buckley. The defendants claim that Buckley would have been forced to move his family from their

home of 10 years in Illinois in order to find employment as a lubricant salesman.

The covenant, however, did not prohibit Buckley from working for Tri-State or any of Tower's competitors. It only required that he refrain from contacting any of Tower's customers or prospects. Spehn's affidavit disclosed that there were approximately 50,000 lubricant customers in the Chicago area. Al Simon's affidavit revealed that when Buckley resigned, Tower had less than 1200 customers and prospects. We do not believe that a covenant which prohibited contact with 2.4% of the market imposed an undue hardship upon Buckley.

The defendants also argue that Buckley was unable to determine which companies were customers or prospects of Tower. We find this argument unpersuasive. Buckley admitted in his deposition that the five customers involved in the lawsuit, whose patronage Tri-State eventually obtained, were his customers when he was employed by Tower.

Our third consideration is whether the restraint imposed by the covenant was greater than was necessary to protect Tower's interests. The defendants assert that the only purpose of Tower's covenant was to create a proprietary interest in its clientele. The defendants assert that the only purpose of Tower's covenant was to create a proprietary interest in its clientele. The defendants argue that such a purpose renders the covenant unenforceable per se. *Image Supplies, Inc.*

■■ Although an employer has no proprietary interest in its customers, it can utilize a restrictive covenant to protect itself from the disadvantageous use of confidential information revealed to an employee during the course of his employment. (*Donald McElroy, Inc.*) In addition, the protection of an established clientele from takeover by a former employee is a legitimate interest of an employer. *J. D. Marshall International, Inc. v. Fradkin* (1980), 87 Ill. App. 3d 118, 409 N.E.2d 4.

We believe that Tower did disclose to Buckley confidential information which justified the use of a protective covenant. Buckley admitted in his deposition that when he was employed by Tower in 1962, he possessed little knowledge of the lubricant industry. During his training he learned how to solve the lubrication problems of his customers. At company meetings held twice a month, Tower salesmen exchanged ideas concerning the servicing of their customers. In addition, the salesmen discussed new products and the proper application thereof.

Such information would be very valuable to a competitor. It is undisputed that the turnover of customers at both Tower and Tri-State was very small. Affidavits of customers stated that because of the expense and inconvenience of testing lubricants, it is very difficult for a competitor to acquire business from a company which has a satisfactory supplier. Prior knowledge of the needs of a prospect, the type of products which

would satisfy these needs, and the proper application of these products would certainly assist a salesman in persuading the prospect to change its supplier.

The defendants also argue that the time limitation of the covenant was unreasonable. We do not believe that the three-year period was an excessive amount of time. Restrictive covenants of similar length have been upheld by reviewing courts. *Frank B. Hall & Co. v. Payseur* (1979), 78 Ill. App. 3d 230, 396 N.E.2d 1246; *Donald McElroy, Inc.; Wessel Co.*

Finally, the defendants argue that the absence of a geographical limitation renders the covenant unreasonable. As we previously discussed, the covenant does not prevent Buckley from working in any particular geographical area, it merely prohibits him from soliciting 2.4 percent of the customers in the Chicago area. Covenants which only restrict the solicitation of former customers are not per se unreasonable. *Donald McElroy, Inc.; Wolf & Co. v. Waldron* (1977), 51 Ill. App. 3d 239, 366 N.E.2d 603.

■■ Our evaluation of the above criteria convinces us that the restrictive covenant was reasonable and enforceable. However, the defendants also assert that because their affidavits raised material issues of fact concerning the existence of trade secrets, it was inappropriate for the trial court to decide the issue of reasonableness on a motion for summary judgment. Summary judgment is properly granted when the pleadings, depositions and admissions on file, together with any affidavits, establish that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Ill. Rev. Stat. 1975, ch. 110, par. 57(3); *Barnes v. Washington* (1973), 56 Ill. 2d 22, 305 N.E.2d 535; *Warchol v. City of Chicago* (1979), 75 Ill. App. 3d 289, 393 N.E.2d 725.

We do not deny that the affidavits raised issues of fact concerning the existence of trade secrets. However, neither the existence nor misuse of a trade secret is required to enforce a restrictive covenant. As discussed earlier in this opinion, an employer can utilize a restrictive covenant to protect itself from the disadvantageous use of confidential information revealed to an employee during the course of his employment. We believe that the undisputed facts establish that the requisite confidential information was disclosed to Buckley.

The defendants also argue that the trial court erred in failing to strike five of Tower's affidavits in support of its motion for summary judgment because they contained hearsay, conclusions and statements made without the personal knowledge of the affiants. The defendants cite Supreme Court Rule 191(a) which provides, in pertinent part, that affidavits in support of and in opposition to motions for summary judgment:

"* * * shall not consist of conclusions but of facts admissible in evidence; and shall affirmatively show that the affiant, if sworn as

a witness, can testify competently thereto." Ill. Rev. Stat. 1975, ch. 110A, par. 191(a).

After reviewing the documents in question, we agree that certain sections of the affidavits should have been stricken. However, if we exclude the objectionable sections, the pleadings, depositions and remaining affidavits shall establish that there was no genuine issue of material fact concerning the reasonableness of the covenant. See *LaMonte v. City of Belleville* (1976), 41 Ill. App. 3d 697, 355 N.E.2d 70.

## II

■■ The defendants assert that because Tower waited 2½ years to file this action, its claim was barred by the affirmative defense of laches. The doctrine of laches is founded on the maxim that equity aids the vigilant and not those who slumber on their rights. (*Harper v. City Mutual Insurance Co.* (1978), 67 Ill. App. 3d 694, 385 N.E.2d 75.) In order to invoke the doctrine, it is necessary to establish that the unreasonable delay in asserting one's rights prejudiced the defendant (*Heinze v. Heinze* (1979), 79 Ill. App. 3d 1121, 398 N.E.2d 1187; *Jager v. Illinois Liquor Control Com.* (1979), 74 Ill. App. 3d 33, 392 N.E.2d 176) or caused him to pursue a course different from what he would have otherwise taken. *People ex rel. Casey v. Health & Hospitals Governing Com.* (1977), 69 Ill. 2d 108, 370 N.E.2d 499.

■■ In the instant case it is undisputed that the defendants were notified of Tower's claim. In May of 1972, correspondence from Tower's attorneys warned the defendants that Buckley was in direct violation of the covenant. Buckley subsequently informed Tower that he would not solicit its customers. When Tower discovered that Buckley was acting contrary to his assurances, it filed suit.

We believe that the defendants were notified promptly of Tower's intention to enforce the covenant. Moreover, laches cannot be used as a defense when the defendant acknowledges the injury and advises the plaintiff that he is taking steps to remedy it. *Hakala v. Illinois Dodge City Corp.* (1978), 64 Ill. App. 3d 114, 380 N.E.2d 1177.

We also find no allegation of prejudice to the defendants as a result of the delay in filing suit. In his deposition Buckley admitted that although he and Davies discussed Tower's threat of legal action, they did not take it too seriously because they had little involvement at that time with Tower's customers. It is apparent that the defendants intended to ignore the existence of the covenant despite the protests of Tower.

## III

The defendants next argue that the trial court erred when it granted summary judgment in favor of Tower on the defendants' counterclaim.

The counterclaim alleged that the restrictive covenant violated the Illinois Antitrust Act. Ill. Rev. Stat. 1973, ch. 38, par. 60—1 *et seq*.

The covenant in question was executed in 1961. The Illinois Antitrust Act was enacted in 1965. In *Vendo Co. v. Stoner* (1974), 58 Ill. 2d 289, 321 N.E.2d 1, *cert. denied* (1975), 420 U.S. 975, 43 L. Ed. 2d 655, 95 S. Ct. 1398, our supreme court held that the Act did not apply to covenants executed prior to the effective date of the Act. Therefore, the trial court's action was proper.

## IV

■■ The defendants contend that the trial court erred in failing to grant its motion for a directed verdict. They argue: (1) that there was no evidence that Buckley's alleged breach of contract caused Tower's loss of business; (2) that Tower's evidence concerning its damages was speculative and conjectural; (3) that there was no evidence to support the findings of inducement and conspiracy, and (4) that there was no evidence to support the award of punitive damages.

A directed verdict should be entered only in those cases in which all the evidence, when viewed most favorably to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.

We first consider whether Tower presented any evidence that Buckley's alleged breach of the contract caused Tower's loss of business. On the issue of causation, the plaintiff must introduce evidence which establishes a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result. Prosser, Torts §41, at 241 (4th ed. 1971).

The evidence revealed that prior to June of 1971, the five customers were stable customers of Tower. Buckley was the Tower salesman involved with four of the five customers. For three years prior to June 1971, Tri-State made less than $5,000 in sales to these five customers.

■■ In June of 1971, Buckley terminated his association with Tower. Two months later he was employed by Tri-State. Subsequently, Tower lost and Tri-State acquired the business of the five customers. Tri-State's invoices indicate Buckley as the salesman on these accounts. Although he maintained at trial that he was only a serviceman to these accounts, in his deposition Buckley admitted that he was the salesman responsible for the sales. We believe that the evidence was more than sufficient to support the jury's finding that Buckley's breach of contract was the cause of Tower's loss of business and to withstand the motion for a directed verdict.

The defendants argue that Tower's evidence concerning its damages was speculative and conjectural. They also contend that Simon's testi-

mony concerning Tower's prior sales to the five customers was legally irrelevant because no evidence was presented to show that these customers would have continued to purchase the same quantities, or any quantity at all, during the subsequent covenant period. We disagree.

■■ Although the exact amount of lost profits resulting from the breach of a noncompetition agreement is impossible to ascertain, such a fact does not justify refusing compensation to the injured party. The plaintiff is only required to present evidence which will establish, with a fair degree of probability, a basis for the assessment of damages. *Schatz v. Abbott Laboratories, Inc.* (1972), 51 Ill. 2d 143, 281 N.E.2d 323; *Hubbard v. Logsdon* (1978), 56 Ill. App. 3d 366, 372 N.E.2d 101.

We believe that Simon's testimony established a reasonable basis for the computation of Tower's lost profits. Although future sales would be dependent to some extent on the uncertain conduct of customers and competitors, one can make a reasonable prediction of future profits of an established business on the basis of its prior sales. (5 Corbin on Contracts §1023, at 147 (1964).) To hold otherwise would only encourage the violation of such restrictive covenants without fear of punishment. *Hubbard.*

The defendants also argue that because there was no evidence to support a finding that Tri-State and Davies induced Buckley and conspired with him to breach his contract with Tower, the verdict should have been directed in their favor. Although there was no direct proof of such tortious activity, a conspiracy can be established by circumstantial evidence. *Lurie v. Village of Skokie* (1978), 64 Ill. App. 3d 217, 380 N.E.2d 1120.

■■ In the instant case Tri-State and Davies were aware of the existence of the covenant which prohibited Buckley from contacting Tower's customers. In addition, they were notified by Tower of its intention to enforce this contract. Nevertheless, Tri-State and Davies permitted their employee, Buckley, to contact and apparently solicit Tower customers for their financial benefit. We believe that this evidence could support a finding that Tri-State and Davies were involved in Buckley's decision to breach his contract and that the motion for a directed verdict was properly denied.

■■ The defendants next argue that there was no evidence to support the award of punitive damages against Tri-State and Davies. Punitive damages may be awarded when torts are committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others. (*Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 384 N.E.2d 353; *Blivas & Page, Inc. v. Klein* (1972), 5 Ill. App. 3d 280, 282 N.E.2d 210.) When the conduct of the defendant is characterized by one

or more of these aggravating circumstances, punitive damages are awarded as a punishment to the wrongdoer and as a means to deter the particular defendant and others from committing like offenses in the future. (*Glass v. Burkett* (1978), 64 Ill. App. 3d 676, 381 N.E.2d 821.) The preliminary question of whether the facts of a particular case justify the imposition of punitive damages is a question of law. (*Kelsay; Queen v. Behm* (1978), 58 Ill. App. 3d 253, 373 N.E.2d 1382.) The trial court's determination of this question will not be disturbed absent an abuse of discretion. *Zokoych v. Spaulding* (1976), 36 Ill. App. 3d 654, 344 N.E.2d 805.

■■ We believe that the trial court's determination that Tri-State and Davies' tortious conduct justified the imposition of punitive damages was not an abuse of discretion. From the evidence presented, one could conclude that Tri-State and Davies acted with a wanton disregard of the contractual rights of Tower. Moreover, the court was aware and obviously considered the fact that Davies attempted to intimidate a possible witness to prevent him from testifying.

■■ We also cannot say that the award was excessive. Although the punitive damages were almost four times the actual damages, punitive damages need not bear a proportional relationship to actual damages. (*Hannigan v. Sears, Roebuck & Co.* (7th Cir. 1969), 410 F.2d 285, *cert. denied* (1969), 396 U.S. 902, 24 L. Ed. 2d 178, 90 S. Ct. 214.) The jury heard evidence that Tri-State's sales to the five customers exceeded $100,000 during the covenant period in contrast to less than $5,000 in sales during the three-year period preceding Buckley's association with Tri-State. It is possible that the jury believed that this award was necessary in order to punish Tri-State and Davies for their profits at the expense of Tower.

## V

The defendants raise several other issues concerning the conduct of the trial. They argue that the trial court erroneously admitted into evidence certain portions of depositions and answers to interrogatories. Statements made during a deposition and written answers to interrogatories are admissible at trial in order to impeach the declarant with an inconsistent statement. (Ill. Rev. Stat. 1977, ch. 110A, pars. 212(a)(1), 213(f).) Having reviewed the record, we believe that there were inconsistencies between the statements at issue and the trial testimony and that the evidence was therefore admissible for impeachment purposes.[1]

---

[1] The defendants also argue that Tower failed to prove the authenticity of Meisner's deposition testimony. Such proof was unnecessary because the officer's certificate attached to the deposition revealed that signature was waived by the parties, and the defendants' attorney so stipulated at trial.

The defendants also argue that the trial court erroneously excluded evidence of Davies' incapacitating injury. Although the defendants argue that such evidence would explain the necessity of hiring Buckley, it would not justify the breach of the covenant. We believe that the only result of the introduction of such evidence would have been to elicit sympathy for Davies from the jury.

The defendants contend that the trial court erred in excluding the testimony of their expert witness concerning the stability of customers in general in the industrial lubricant industry. We believe that the exclusion was proper because only the stability of five customers was at issue.

The defendants assert that the trial court issued improper jury instructions on issue, contributing cause, definition, agency, compensatory damages, willful and wanton, conspiracy and inducement of breach. However, the defendants have not offered any explanation of the reason they believe these instructions are erroneous. Thus, they have not preserved this issue for review. *Burke v. Illinois Power Co.* (1978), 57 Ill. App. 3d 498, 373 N.E.2d 1354; *Prather v. Lockwood* (1974), 19 Ill. App. 3d 146, 310 N.E.2d 815.

■■ The defendants further object to the trial court's instruction that "the court finds as a matter of law that Buckley's agreement not to sell is proper, reasonable, legal and enforceable." The defendants contend that this instruction was "unnecessarily firm." We disagree. The instruction accurately and fairly related to the jury that the trial court had determined that the employment contract was reasonable and enforceable.

The defendants also argue that the trial court should not have instructed the jury concerning punitive damages. However, as we have previously discussed, there was evidence to support the trial court's determination that Tri-State and Davies' tortious conduct justified the imposition of punitive damages. Thus, an instruction on punitive damages was appropriate.

The defendants also assert that the only explanation for the jury's verdict is that it disregarded the instructions on proximate cause and willful and wanton conduct. As we previously discussed, the jury's award of both compensatory and punitive damages was supported by the evidence. The defendants' assertion that the jury disregarded certain instructions is purely speculative.

Finally, the defendants maintain that the verdicts were the product of passion and prejudice engendered by the improper conduct of Tower's trial counsel. After reviewing the trial transcript, it is our opinion that this argument is without merit.

## VI

Tower cross-appeals from the denial of its motion for costs and

attorneys' fees. It contends that the defendants filed untrue pleadings and discovery answers concerning whether Buckley was a salesman or serviceman. The affidavit of Tower's attorney states that Tower incurred over $10,000 in fees and costs in order to prove that Buckley sold products to the five customers in question.

Section 41 of the Civil Practice Act provides, in pertinent part, that:

"Allegations and denials, made without reasonable cause and found to be untrue, shall subject the party pleading them to the payment of reasonable expenses, actually incurred by the other party by reason of the untrue pleading, together with a reasonable attorney's fee." (Ill. Rev. Stat. 1977, ch. 110, par. 41.)

Because this section is penal in nature, it should be invoked only in cases that fall strictly within the terms of its authorization. (*Medical Modalities Associaties, Inc. v. Quick* (1978), 65 Ill. App. 3d 300, 382 N.E.2d 620; *Farwell Construction Co. v. Ticktin* (1978), 59 Ill. App. 3d 954, 376 N.E.2d 621.) The allowance of fees pursuant to this section is discretionary with the trial court, and its determination should not be disturbed unless there is a clear abuse of discretion. *Farwell Construction Co.*

We cannot say that the trial court abused its discretion by refusing to award attorneys' fees and costs. One of the issues at trial was whether Buckley was initiating sales to the five customers or was merely acting as a serviceman. The fact that the jury resolved the issue in Tower's favor does not necessarily establish that the defendants acted without reasonable cause in denying Tower's allegations. *Farnor v. Irmco Corp.* (1979), 73 Ill. App. 3d 851, 392 N.E.2d 591.

Tower also argues in its cross-appeal that it is entitled to recover damages for the diminution of the value of its business at the end of the covenant period. The trial court excluded testimony that the value of Tower's business was diminished by $5,000 for each $1,000 in lost profits sustained by Tower.

We believe that the determination of lost profits during the covenant period was the proper measure of damages in this case. Tower relies on *Vendo Co. v. Stoner* (1974), 58 Ill. 2d 289, 321 N.E.2d 1, *cert. denied* (1975), 420 U.S. 975, 43 L. Ed. 2d 655, 95 S. Ct. 1398, in which an award of damages for diminution of value was affirmed. However, the facts in *Vendo Co.* are clearly distinguishable from the facts in the instant case.

*Vendo Co.* involved a breach of covenant incidental to the sale of a very successful business. Moreover, one of the defendants was a director and officer of the plaintiff corporation at the time he was competing with the plaintiff. In discussing the determination of damages assessed against the defendants, the supreme court commented that "defendants' liability is not measured exclusively by these covenants but rests as well on a breach of fiduciary obligations." 58 Ill. 2d 289, 313.

In the instant case the restrictive covenant was not incidental to the sale of a business. In addition, no defendant was guilty of a breach of a fiduciary duty. If we permitted Tower to recover diminution damages in addition to lost profits, it would be the recipient of a windfall.

For the foregoing reasons, the judgment of the Circuit Court of Cook County is hereby affirmed.

Affirmed.

RIZZI, P. J., and McNAMARA, J., concur.