FRANK B. HALL & CO., INC., *et al.*, Plaintiffs-Appellees, *v.* JAMES C. PAYSEUR *et al.*, Defendants-Appellants.

First District (4th Division)    No. 78-1505

Opinion filed November 1, 1979.

Matt P. Cushner and Marilee Roberg, both of Pedersen & Houpt, of Chicago, for appellants.

James L. Perkins and John L. Huff (Winston & Strawn, of counsel), for appellees.

Mr. JUSTICE JOHNSON delivered the opinion of the court:

Plaintiffs-appellees, Frank B. Hall & Co., Inc. (Hall), a Delaware corporation, and Frank B. Hall & Co. of Illinois, Inc. (Hall of Illinois), an Illinois corporation, a subsidiary of Hall, filed this action in the circuit court of Cook County on June 26, 1978, for declaratory judgment, injunctive relief, and damages arising out of a covenant not to compete signed by plaintiffs' former officer-employee, James C. Payseur, defendant-appellant. Bayly, Martin & Fay of Illinois, Inc. (Bayly of

Illinois), an Illinois corporation, owned 50 percent by Payseur and 50 percent by Bayly, Martin & Fay International (Bayly International), was also named as a defendant. In addition to the defendants participating in this appeal, Lorraine Grenvich and Bayly, Martin & Fay, Inc., a Delaware corporation, were named as defendants. Grenvich was later dismissed from the trial court case insofar as it related to the equitable relief sought by plaintiffs. On June 27, 1978, the trial court entered a temporary restraining order, and on August 9, 1978, a preliminary injunction was entered from which this appeal is taken. We affirm.

Plaintiff Hall is a holding company of approximately 30 subsidiary corporations, engaged in the insurance brokerage business, with over 100 offices in the United States and foreign countries. Hall employs approximately 2900 people and services approximately 200,000 customers. In 1977, its income was approximately $150 million.

In 1975, Hall of Illinois, which previously had one office in Chicago, Illinois, opened a second office in Des Plaines, Illinois, specializing in packaged group insurance. The Des Plaines office, prior to the events of which plaintiffs complain, had approximately 800 customers, 12 employees, and an annual income of about $1,350,000.

Prior to his resignation in May 1978, defendant Payseur was a director and vice-president of Hall of Illinois and was in charge of the Des Plaines office. He was a full-time employee, earning $150,000 annually for his services. Payseur is president of Bayly of Illinois which was incorporated May 16, 1978.

Prior to her resignation, defendant Grenvich was second in command under Payseur in the Des Plaines office of Hall of Illinois. She was a vice-president and an account executive and office manager of that office. In 1977, she received $32,000 in salary and $12,000 in bonus from the company.

The packaged group insurance sold by Hall of Illinois is an insurance program involving several types of coverage, e.g., casualty, fidelity, property, marketed with one insurance carrier for several customers with common insurance needs, i.e., trade associations, quasigovernmental agencies, and clubs. Prior to the events of which plaintiffs complain, approximately 110 Illinois park districts and 300 laundromats were insurance customers of Hall of Illinois.

In 1972, Hall acquired the business and customers of the Archer & Company Insurance Agency (Archer Agency) for approximately $7 million. Most of the packaged group insurance customers involved in this litigation were acquired at that time. Defendants Payseur and Grenvich were employees of the Archer Agency and became Hall of Illinois employees. Payseur received approximately $400,000 for the stock he held

in the Archer Agency. He also executed a covenant not to compete, the pertinent provisions of which read as follows:

"3. In addition to the covenants set forth above, Stockholder covenants and agrees that for the period commencing as of the date of termination of his employment with Hall of Illinois and ending three (3) years from such date, he will not compete directly or indirectly in any way with the business of Hall or Hall of Illinois. For the purpose of this paragraph, the term 'compete in any way with the business of Hall or Hall of Illinois' shall mean the entering into or attempting to enter into any similar business with that carried on by Hall or Hall of Illinois with any individual, partnership, corporation or association that was a client or customer of Hall or Hall of Illinois within the six (6) calendar months immediately preceding the date of termination of his employment or who becomes a client or customer of Hall or Hall of Illinois within the six (6) calendar months immediately following the date of termination. As used herein 'client' or 'customer' shall mean any entity listed on the books of Hall or Hall of Illinois.
* * *

5. Stockholder hereby agrees not to induce any person who is an employee of Hall, or a subsidiary of Hall, including Hall of Illinois during the term of the covenants set forth herein to leave the employ of Hall, or a subsidiary of Hall, as the case may be.

6. Stockholder hereby agrees that the remedy at law for any breach by him of the covenants set forth herein will be inadequate and that Hall or Hall of Illinois shall be entitled to injunctive relief. In addition, Stockholder agrees to indemnify Hall and Hall of Illinois and to hold them harmless against any loss, cost, liability or expense (including reasonable attorney's fees) incurred by Hall or Hall of Illinois by reason of the breach or non-fulfillment of any agreement, representation or warranty herein contained.

7. This Covenant Not to Compete shall be construed and enforced in accordance with the laws of the State of Illinois. The covenants set forth herein shall be construed as separate covenants covering competition in the entire State of Illinois."

Payseur and Bayly International executed an agreement on May 12, 1978, to form a new corporation, Bayly of Illinois. Bayly International agreed to loan Bayly of Illinois up to $200,000 to meet operating expenses and to insure Payseur's salary which would be $150,000 per year for a period of 3 years, plus a bonus not to exceed 20 percent of the annual net profits of Bayly of Illinois. Payseur testified that Bayly International was furnished a copy of the covenant not to compete prior to the execution of

the agreement signed on May 12, 1978. Payseur and Bayly International would each subscribe to 50,000 shares of stock for $50,000. On May 13, 1978, Payseur announced his plans to resign from Hall of Illinois in 2 weeks. At that time, he offered to purchase some of the Hall of Illinois Des Plaines office customers and to take over the lease on the Des Plaines office space and purchase the fixtures and furniture. His offer was rejected. Lorraine Grenvich resigned from Hall of Illinois in June 1978 and agreed to work for Payseur in Bayly of Illinois.

On June 26, 1978, Bayly of Illinois opened for business in an office approximately 200 yards away from the Hall of Illinois Des Plaines office with 8 employees, all of whom had resigned from Hall of Illinois during the week of June 19, 1978, leaving the Des Plaines office with 3 out of 12 employees. On that same day, defendants began to advertise its business with the Illinois park districts and laundromats. According to Payseur, the letters were not sent exclusively to Hall of Illinois customers. One type of letter was sent to 200-300 of the park districts listed in the Illinois Park District Association directory. Another type of letter, announcing the VIP plan, was sent to 5000 laundromats across the country from a list obtained from a laundromat manufacturer in Texas. In pertinent part, the letter sent to the park districts appeared as follows:

> "We are very pleased to announce the formation of our new insurance brokerage firm and our association with Bayly, Martin and Fay. Our new offices are in operation now and we are asking you for the opportunity to continue to represent you in all your insurance matters, as we have in the past.
>
> We are proud of the credentials that we can bring you in our new connection:
>
> > 1. Most all of the same people with whom you have been dealing on your insurance matters are a part of our team. They have expertise in your needs insurance-wise and are committed to superb service.
> > 2. We will be placing coverage and issuing policies in the same insurance companies that provide your protection now. We think it is very important to maintain this continuity because you can take advantage of your good record on an on-going basis.
> > 3. Our connection with Bayly, Martin and Fay gives us additional avenues to expand our buying power leverage for you. * * *
> > * * *
>
> * * * [W]e will need your authorization per the enclosed letter copy. By issuing this letter on your stationery, you will be re-establishing the same people to people contact that we have all

enjoyed. At the same time, you will be allowing us to pick up the day to day service needs you do have on your insurance program now regardless of what your overall policy anniversary dates may be.

We recognize that changing insurance brokers does not happen too often but it is common in cases where the client wants to be represented by the same professional insurance people and the same insurance companies where all are well acquainted, knowledgeable and interested in one another. This is our situation. We have changed business cards if you will, but will remain active and committed to park and recreation insurance.

We want to do business with you and trust you as Commissioners together with your professional staff, will agree that this will be a good move for you. * * *

We will be contacting you very shortly to arrange the time and place for a session with you on this subject.

Very truly yours,

James C. Payseur
Lorraine Grenvich
Ronna Larsen
Carrie Stevens
Hal Lawson."

According to plaintiffs, the letter sent by defendants to prospective laundromat customers contained a letterhead identical (except for the address) to the VIP Plan letterhead used by Hall of Illinois in its dealings with laundromats. The VIP Plan, acquired with the business and assets of the Archer Agency, is a packaged group insurance program offered exclusively by plaintiffs to its laundromat customers. The VIP Plan letter, in pertinent part, follows:

"To all our VIP Plan clients nationally:

All of us at VIP Plan Insurance are pleased to announce our move to new, expanded offices at

1011 Touhy Avenue
Des Plaines, Illinois 60018
312-298-9620

We are also pleased to announce our association with Bayly, Martin & Fay, Inc., one of the top 10 leading national insurance brokerage firms. Henceforth we will be placing insurance through the facilities of Bayly, Martin & Fay to gain additional national buying coverage for each of our clients.

With Pat Langenberg, our other staff members and myself, we assure you of our continuing commitment to serve your insurance

needs with our same good policy, good coverage and good claim facilities. We thank you for your support and participation.

    ° ° °

In order for our insurance company to clear their records on your account servicing, we ask that you sign and return the enclosed appointment authorization, reaffirming that VIP Plan and Bayly, Martin & Fay, Inc. are your insurance representatives for your business insurance at your store.

Please do this today in order that we can provide uninterrupted policy service for you.

    ° ° °

> Thanks a million,
>
> James C. Payseur."

We have been asked to decide (1) whether the covenant not to compete was void as against public policy; (2) whether the trial court erred in granting the preliminary injunction; and (3) whether the trial court had jurisdiction to enter the preliminary injunction.

Defendants argue that the covenant not to compete is invalid under Illinois law because it is broader than necessary to protect plaintiffs' legitimate interests. Defendants cite *Union Strawboard Co. v. Bonfield* (1901), 193 Ill. 420, 61 N.E. 1038, for the established proposition that statewide territorial restrictions are void in Illinois. In *Union Strawboard*, our supreme court said:

> "It is against the policy of the State that its citizens should not have the privilege of pursuing their lawful occupations at some place within its borders, and that a citizen should be compelled to leave the State to engage in his business and to support himself and family." 193 Ill. 420, 427.

But, we agree with plaintiffs' argument that the covenant, in the instant case, is valid in that it only restricts defendant Payseur from competing for plaintiffs' existing customers in Illinois. It places no restrictions on competing for new business in Illinois or outside the State and applies only to persons who were plaintiffs' insurance customers 6 months before and 6 months after Payseur's resignation.

In *Group Association Plans, Inc. v. Colquhoun* (D.C. 1968), 292 F. Supp. 564, 566, a similar case, where a prepackaged group insurance broker signed a restrictive covenant in connection with his employment contract, the court held:

> "In many cases ° ° ° covenants bar and preclude the employee from competing with his former employer in any way within a limited area and for a limited period of time. In this instance,

however, the negative covenant is not as severe or broad as this. It merely bars the defendant from soliciting business from concerns that were his employer's customers during the employee's term of employment. Otherwise he was free to carry on any competing activities in the same line of business as he chose. Because of the limited nature of the restriction and because the plaintiff's business is nationwide, the Court is of the opinion that this restrictive covenant is reasonable, both as to area and as to time."

Recent Illinois cases support the notion that an employer is entitled not to have his old customers enticed away from him by solicitation or other such means. *Wessel Co. v. Busa* (1975), 28 Ill. App. 3d 686, 693, 329 N.E.2d 414, 419; *Central Keystone Plating of Illinois, Inc. v. Hutchinson* (1965), 62 Ill. App. 2d 188, 193, 210 N.E.2d 239, 242.

It appears that the purpose of the covenant not to compete that Payseur signed was the same as the one reviewed in *Wolf & Co. v. Waldron* (1977), 51 Ill. App. 3d 239, 242, 366 N.E.2d 603, 605, where the court found:

"The purpose of the restrictive covenant was to protect plaintiff from losing its clients to former employees by reason of the familiarity gained with the clients' affairs during the course of employment. * * * [I]t evidenced a single-minded desire by plaintiff to protect itself from any unfair advantage which a former employee may attempt to exploit."

■■ We hold that, here, where the employee signed a covenant not to compete in Illinois for 3 years with his employer for its customers who became clients 6 months prior to his termination or 6 months after his termination, the restrictive covenant was reasonable, both as to area and as to time and was, therefore, not void as against public policy.

The next question is whether the preliminary injunction should have been issued.

The grant or denial of a preliminary injunction rests in the sound discretion of the trial court. This appellate court must uphold that decision unless we find the trial judge abused his discretion. (*Schlicksup Drug Co. v. Schlicksup* (1970), 129 Ill. App. 2d 181, 186, 262 N.E.2d 713, 715.) The purpose of a preliminary injunction is to preserve the status quo (*Schlicksup*, at 186-87), not to determine controverted rights or decide the merits of the case. (*Nemirow v. Kuhn* (1971), 133 Ill. App. 2d 604, 607, 273 N.E.2d 532, 534.) Therefore, this court will limit its review to the sufficiency of the evidence for the sole purpose of determining whether the trial court judge abused his discretion by granting the preliminary injunction.

"In order for a preliminary injunction to issue, the petitioner must establish a need to preserve the status quo in order to prevent

irreparable injury for which there is no adequate remedy at law, and a likelihood of success on the merits." *Armour & Co. v. United American Food Processors, Inc.* (1976), 37 Ill. App. 3d 132, 135-36, 345 N.E.2d 795, 798.

■■ We think this test was met in the instant case. The record reveals that at the time the preliminary injunction was issued plaintiffs had already lost customers to defendants. Cases have held that a preliminary injunction may be issued even before the actual injury occurs. In *Office Electronics, Inc. v. Grafic Forms, Inc.* (1978), 56 Ill. App. 3d 395, 399-400, 372 N.E.2d 125, 129, the court said:

"While no evidence of sales actually lost to Grafic was presented at the hearing on the motion for preliminary injunction, '[t]here is no requirement that a court must wait until an injury occurs before granting relief. [Citation.]' (*Armour & Co. v. United American Food Processors, Inc.* (1976), 37 Ill. App. 3d 132, 137, 345 N.E.2d 795, 799.) * * *

* * * It is not necessary that plaintiff's proof at this stage be incontrovertible or complete in every detail. The issuance of the injunction does not determine the ultimate rights of the parties nor does it finally decide the merits of the case. 'All that is necessary is that the petitioning party raise a fair question as to the existence of the right claimed and lead the court to believe he probably will be entitled to the relief prayed for if the proof should sustain his allegations.' [Citation.] Whether defendant McSweeney's actions constituted a breach of his employment contract are for the trial court to decide at a hearing on the merits."

We think plaintiffs in the instant case raised a fair question as to the existence of the right claimed and led the court to believe it probably would be entitled to the relief prayed for if the proof sustained its allegations. We said, in *TAD, Inc. v. Siebert* (1978), 63 Ill. App. 3d 1001, 1005, 380 N.E.2d 963, 966:

" 'If a salesman has agreed to a restrictive covenant in his employment contract * * *, under proper circumstances, such salesman might be enjoined from soliciting business from the customers of his prior employer. * * *.' [Citation.]"

We believe the evidence in the instant case was sufficient for the proper issuance of a preliminary injunction, and the trial judge did not abuse his discretion in granting it.

The final question is whether the trial court had jurisdiction to issue a preliminary injunction. Defendants argue that the judgment in the trial court should be set aside because this case is not a true declaratory judgment action, and the trial court had no jurisdiction to enter the preliminary injunction because the court, in effect, rescinded and/or

reformed the covenant not to compete. Defendants argue that the case was misfiled in the law division and should have been filed in the chancery division.

■■ We find that plaintiffs' complaint was a true declaratory judgment action and meets all the requirements of section 57.1 of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 57.1), which states:

> "(2) Subject to rules, declarations of rights, as herein provided for, may be obtained by means of a pleading seeking that relief alone, or as incident to or part of a complaint, counterclaim or other pleading seeking other relief as well, and if a declaration of rights is the only relief asked, the case may be set for early hearing as in the case of a motion."

Defendants argue that counts II and III of plaintiffs' complaint are for damages and injunctive relief. However, cases have held that the existence of another remedy does not preclude a complaint for declaratory judgment. (*Baugher v. Walker* (1977), 47 Ill. App. 3d 573, 577, 362 N.E.2d 410, 414; *Department of Illinois Disabled American Veterans v. Bialczak* (1976), 38 Ill. App. 3d 848, 852, 349 N.E.2d 897, 901.) Furthermore, this action was filed in the circuit court of Cook County which has original jurisdiction over all justiciable matter.

We hold, therefore, that plaintiffs' complaint was properly filed in the Law Division of the Circuit Court of Cook County.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

ROMITI and LINN, JJ., concur.