WELLFORD, Circuit Judge.
 

 John and Barbara Talmage, husband and wife, herein referred to as “Talmage”, entered into a licensing agreement in 1978 with Comprehensive Accounting Corporation, herein referred to as “CAC”, which permitted Talmage to use CAC’s system of accounting and soliciting accounts. Under the agreement Talmage also became eligible to purchase client accounts that CAC developed. Indeed, Talmage purchased a number of these accounts from CAC, although it is not clear from the record whether Talmage obtained all of its clients through CAC’s marketing network. In each of the “Client Service Agreements” both Talmage and the client agreed to permit CAC “to assign or re-assign this Agreement to one of its Independent Associated Accounts” and “to substitute accounts if ... the accountant is otherwise in default of its obligations to [CAC].”
 

 In February of 1983 Talmage filed for relief under Chapter 7 of the Bankruptcy Code at which time CAC alleges Talmage owed them $250,000. Talmage admits owing almost 1200,00o.
 
 [1]
 
 Under the terms of the parties’ various agreements, CAC now wishes to prevent Talmage from continuing to serve any of CAC’s clients, and petitions to have Talmage turn over the client’s books and records, and the accountant work papers associated with the accounts involved.
 

 The license agreement between CAC and Talmage included the following pertinent language:
 

 Agreement Not To Compete.
 
 During the time Licensee [Talmage] is associated, and for a period of one (1) year after its status as a Licensee is terminated, whether by reason of lapse of time, default in its performance, or any other case or contingency Licensee or Associate will not, in any capacity directly or indirectly engage in the following activities:
 

 1. Perform bookkeeping services for any client then currently serviced or for one year after it has ceased to be serviced by COMPREHENSIVE or another Licensee.
 

 2. Make use of any trade secrets of COMPREHENSIVE for the mass solicitation of accounts or use of mass media as opposed to personal contact.
 

 It is important to note, however, that nothing in the agreement prohibited Tal-mage from soliciting other accounts separate and apart from the CAC clients.
 
 [2]
 
 
 *164
 
 CAC then provided Talmage with clients, although CAC permitted Talmage to develop its practice in addition to the CAC accounts transferred. Under the restrictive covenant, even after default, Talmage may develop an accounting practice as long as the clients it solicits are not CAC clients, which is contrary to the district judge’s conclusion that the covenant “would effectively remove John Talmage from practicing the accounting profession.”
 

 Because Talmage procured extensive financing from CAC, Talmage was required under the terms of the financing agreement (not the license agreement) as additional security for the financing to have each client procured by Talmage sign a “Client Service Agreement” that essentially made the new
 
 [3]
 
 Talmage client a CAC client. There is no indication that this requirement would have been imposed absent extensive financing from CAC to Talmage. The “Client Service Agreements” allowed CAC to assign the service contract to other accountants upon Talmage’s default, or upon termination.
 

 Another provision in the finance agreement which is at issue gave CAC the right “to take possession of Talmage’s entire practice subsequent to Talmage’s default”:
 

 Right to Repossess:
 
 Licensee recognizes that in the event of Licensee’s default it is essential that COMPREHENSIVE have the clear and unrestricted right to take possession of all the Licensee’s practice. This right inures to COMPREHENSIVE in the event of any defaults as set out in Article III Paragraph A above. COMPREHENSIVE will exert every effort to insure that all of these accounts successfully transfer to another Licensee or accountant and to realize the best possible price for each account.
 

 Effectively, then, Talmage’s accounting practice, upon default, would become CAC’s, but Talmage would not be precluded from obtaining other non-CAC accounts or from working with other accounting firms. After a default, CAC must sell the accounts to another accountant and set off the sale price against the debts it is owed.
 

 The facts in the case are not disputed. The parties stipulated that two legal issues were to be decided:
 

 1. Whether Comprehensive has a valid security interest in the accounts; and
 

 2. Whether restrictive covenants are enforceable that prohibit Debtors from soliciting or servicing accounts once they are transferred to Comprehensive.
 

 The virtually uncontested eight page complaint of CAC was before the court plus an uncontested affidavit of Amos T. Finkle, CAC Vice President, describing the arrangement between the parties. Tal-mage would, and did, utilize CAC’s trademark, data processing center, its various accounting and bookkeeping procedures, the accounts assigned to it, as well as CAC’s alleged trade secrets.
 
 [4]
 
 CAC was found to have a “valid and enforceable security interest in the accounts receivable, contract rights and work papers of Tal-mage, Inc.” (the corporate name under which Talmage operated). Initially CAC claimed a similar security interest in the books and records of clients possessed by Talmage, but this contention has been dropped, and CAC only claims such an interest in work papers with reference to such client accounts. Talmadge on brief disputed the court’s finding of a valid security interest in the “accounts,”
 
 [5]
 
 but made no argument challenging the correctness of the conclusions that CAC had a
 
 *165
 
 valid security interest therein to the extent recognized by the district court.
 

 There is some contention by CAC that both the bankruptcy judge and the district court made unfounded factual findings or drew conclusions from assumed facts not actually before them, especially with regard to trade secrets. The bankruptcy judge, however, merely concluded that “general knowledge gained by an employee during his employment” are not “worthy of protection” under Illinois law as “trade secrets,” and that CAC’s “method of providing services cannot be protected” even if characterized as a “trade secret.” The district court, without discussion, concluded that the “trade secret” rights asserted by CAC would not be enforced. We find the bankruptcy court’s reference to “employee general knowledge” inappropriate, however, because the agreements between the parties are not between employer and employee, but rather are between independent business entities, a licensor and licensee, an assignor and assignee.
 

 Under Illinois law a different standard is applied in considering employer-employee rather than licensor-licensee agreements involving restrictive covenants. The important issue, therefore, is whether there is a valid restrictive covenant between these business entities since we conclude that Talmage is not treated as an employee by CAC, but rather as a licensee, a separate contractor. In this respect we differ with the bankruptcy court which referred to Illinois cases dealing with restrictive covenants between an employer and employee.
 
 See Revcor, Inc. v. Fame, Inc.,
 
 85 Ill.App.2d 350, 228 N.E.2d 742 (1967);
 
 Solar Textiles Co. v. Fortino,
 
 46 Ill.App.2d 436, 196 N.E.2d 719 (1964);
 
 Snyder v. Hamilton,
 
 39 Ill.App.2d 352, 189 N.E.2d 97 (1963), all of which we find inapposite. Similarly, the district court mischaracter-ized the covenant not to compete as a “restrictive employment covenant.” The bankruptcy court, misapplying an employer-employee relationship to this licensor-li-censee arrangement between independent business entities, was in error therefore in reaching the legal conclusion that “no legitimate interests of Comprehensive [CAC] exist to support the restrictive covenant imposed.” See
 
 O’Sullivan v. Conrad,
 
 44 Ill.App.3d 752, 3 Ill.Dec. 383, 358 N.E.2d 926 (1976), noting this distinction. Likewise, the district court erred in finding the covenant not to compete as “greater than necessary to protect the legitimate [employer] interests of Comprehensive [CAC].”
 

 The factors considered in evaluating the validity and enforceability of a covenant not to compete between employer and employee under Illinois law are:
 

 1) the injury to the public;
 

 2) the possible undue hardship to the promisor;
 

 3) whether the restraint is greater than necessary to protect the promisee’s interest; and
 

 4) the reasonableness of time limitations and geographic scope of the covenant.
 

 Tower Oil & Technology Co. v. Buckley,
 
 99 Ill.App.3d 637, 54 Ill.Dec. 843, 848, 425 N.E.2d 1060, 1065 (1981). The type of covenant involved in this case, one ancilliary to a sale or license agreement, however, is scrutinized to determine whether the restriction is reasonable, or “necessary in its full extent for the protection” of the one party “and at the same time not ... oppressive” to the other party “or injurious to the interests of the general public.”
 
 O’Sullivan v. Conrad,
 
 44 Ill.App.3d at 756, 3 Ill.Dec. at 386, 358 N.E.2d at 929. The determination to be made is a question of law.
 
 Barrington Trucking Co. v. Casey,
 
 117 Ill.App.2d 151, 253 N.E.2d 36 (1969);
 
 O’Sullivan, supra; Tower Oil, supra.
 

 The
 
 Tower Oil
 
 case involved a suit by a former employer against the former employee seeking to enforce a restrictive covenant in an employment contract. Like other cases involving this kind of relationship, the courts are more concerned about hardship to an individual employee such as
 
 *166
 
 Buckley, a lubricant salesman, in his ability to earn a living than they are to a separate business entity, in the instant case an accounting business, or even a professional accountant, in considering “undue hardship” imposed by the restriction. Yet in
 
 Tower Oil,
 
 the court recognized the “social utility” of a “post-employment” restrictive covenant to “protect the employer from the unwarranted erosion of confidential information.” 54 Ill.Dec. at 848, 425 N.E.2d at 1065. In
 
 Tower Oil,
 
 a three-year period of restriction without geographic limitation was found to be reasonable to protect the employer from “disadvantageous use of confidential information revealed to an employee.” 54 Ill.Dec. at 849, 425 N.E.2d at 1066.
 
 Tower Oil
 
 recognized also the propriety of “protection of an established clientele from takeover by a former employee as a legitimate interest.”
 
 Id. See also Donald McElroy, Inc. v. Delaney,
 
 72 Ill.App.3d 285, 27 Ill.Dec. 892, 389 N.E.2d 1300 (1979);
 
 J.D. Marshall Int’l Inc. v. Fradkin,
 
 87 Ill.App.3d 118, 42 Ill.Dec. 509, 409 N.E.2d 4 (1980).
 

 Although
 
 Tower Oil
 
 dealt with an employer-employee situation and involved much more severe time limitations on a non-professional worker, the court held the restrictive covenant agreement to be reasonable. Covenants of greater length that the one year limitation here involved have been upheld in a number of other Illinois cases.
 
 See Donald McElroy, Inc., supra; Frank D. Hall & Co. v. Payseur,
 
 78 Ill.App.3d 230, 33 Ill.Dec. 522, 396 N.E.2d 1246 (1979). Again, in
 
 Tower Oil
 
 there was the absence of a geographical limitation in the covenant, but, as in the instant situation, Tower Oil’s employee, Buckley, was not prevented from working in any particular geographical area.
 
 See also J.D. Marshall, supra.
 
 The circumstances in
 
 Tower Oil,
 
 in summary, created a greater hardship on the limited party than does the covenant not to compete executed by Tal-mage. Although it involved an employer-employee arrangement, which is viewed more narrowly and construed more strictly than the business license arrangement involved between CAC and Talmadge, it was deemed to be “reasonable and enforceable.” In this case we may also presume that the business entities involved entered into their agreements, including the covenant not to compete, “voluntarily after arm’s length negotiations.”
 
 See O’Sullivan v. Conrad,
 
 44 Ill.App.3d at 757, 3 Ill.Dec. at 387, 358 N.E.2d at 930.
 

 We perceive no serious injury to the pub-, lie in respect to the terms of a one year covenant not to compete, although it is not limited in geographic scope, that is designed to protect the legitimate business interests of CAC, whether deemed confidential information, good will, trade secrets or established clientele lists.
 
 [6]
 
 The federal appellate court, sitting in Illinois has recognized that courts in that state will enforce reasonable covenants not to compete to protect “good will of a firm’s business” or “confidentiality of information valuable to a firm’s business” or other “certain types of contractual relations entitled to protec-tion_”
 
 American Hardware Mutual Ins. Co. v. Moran,
 
 705 F.2d 219, 221-22 (7th Cir.1983). The determination of the reasonableness of the agreement is a question of law and is freely reviewable by this court.
 
 Roth Steel Products v. Sharon Steel Corp.,
 
 705 F.2d 134 (6th Cir.1983).
 

 We also conclude that the restraint here involved, considering all the circumstances, including the posture of the parties, is not substantially greater than necessary to protect the legitimate interest of CAC in enforcement. We construe the covenant not to compete, as CAC itself argues that it should be construed, not for an indeterminate term but for a one year term only, and conclude that such time limitation is reasonable, as are the other constraints on Talmage for that period. The covenant was clearly ancillary to a license agreement and a sale, transfer or assignment of accounts, and is enforceable. In this respect, then, we reverse the decision of the district court that the covenant was not enforceable as to Talmage. We affirm the district
 
 *167
 
 court decision, however, that CAC has a valid and enforceable security interest in accounts receivable, contract rights and work papers of Talmage. In addition, we hold that Talmage should reasonably be called upon under the agreement with CAC to turn over
 
 copies
 
 of books and records pertaining to clients’ accounts that are in Talmage’s possession (or in the possession of Talmage, Inc.). The original books and records that may belong to clients, of course, would not be covered by the security interest, as conceded by CAC.
 

 As previously noted, it is important to observe that this action does
 
 not,
 
 as held by the bankruptcy judge and the district court, effectively remove Talmage from the accounting profession, nor does it require supervision by either court of each of the accounts covered by the agreements as we have interpreted them.
 

 This ease is accordingly Remanded to the bankruptcy court for further proceedings consistent with this opinion.
 

 [1]
 

 . This debt was secured in part of a $21,000 second mortgage of the Talmadge residence and the lower courts agreed that the mortgage was valid.
 

 [2]
 

 . The appropriate part of the agreement reads:
 

 Right to Solicit and Service Other Accounts:
 
 Licensee’s right to solicit and perform bookkeeping, accounting, and tax services for any and all persons shall be unaffected by this Agreement, except as provided for herein-after_
 

 [3]
 

 .The particular part of the agreement provided:
 

 [Talmage will] require all clients procured other than from COMPREHENSIVE [CAC] to sign a properly completed "Client Service Agreement," a copy of which must be filed with COMPREHENSIVE. All such "Client Service Agreements" must be properly executed and attached to Licensee’s "Growth Report” which is filed monthly with COMPREHENSIVE. No credit will be given to Licensee for any referral until such a "Client Service Agreement” is filed with COMPREHENSIVE.
 

 [4]
 

 . Talmadge conceded that the complaint substantially set out undisputed facts, but its answer challenged CAC’s interpretation of these facts, particularly whether any trade secrets actually were involved.
 

 [5]
 

 . The agreement provided the following description of an "account”:
 

 
 *165
 
 An account is a business which agreed to have its bookkeeping, accounting, consulting or tax work performed by a Licensee of Comprehensive in accordance with the Comprehensive system. It includes all of the books, records, work papers and any and all other documentation necessary to service that account....
 

 [6]
 

 . As the court in
 
 Tower Oil
 
 noted, "neither the existence nor misuse of a trade secret is required to enforce a restrictive covenant." 54 Ill.Dec. at 850, 425 N.E.2d at 1067. Thus we need not determine whether CAC’s accounting methodology constitute trade secrets.