ARPAC CORPORATION, Plaintiff-Appellee, v. CHARLES R. MURRAY *et al.*, Defendants-Appellants.

First District (2nd Division)   No. 1—91—2584

Opinion filed February 11, 1992.—Rehearing denied March 25, 1992.

Hough, Cook, Weatherhead & Kinsella, of Chicago (Charles R. Murray, John A. Cook, and Mercedes Matias, of counsel), for appellants.

Levenfeld, Eisenberg, Janger, Glassber, Samotny & Halper, of Chicago (James T. Rohlfing and Mark J. Bereyso, of counsel), for appellee.

JUSTICE DiVITO delivered the opinion of the court:

Plaintiff Arpac Corporation (Arpac) sought injunctive and other relief from its former employee, defendant Charles Murray, based upon Murray's employment agreement containing a restrictive covenant. After an evidentiary hearing, the circuit court entered a preliminary injunction, enjoining Murray and Bundling Machines International, Inc. (BMI), his current employer, from soliciting any of Arpac's customers of the previous five years for a period of 24 months. The court further enjoined Murray from influencing Arpac's employees to leave the company and from working in Arpac's area of business for two years. Murray appeals pursuant to Supreme Court Rule 307(a)(1) (134 Ill. 2d R. 307(a)(1)), raising in issue (1) whether the circuit court's grant of injunctive relief was against the manifest weight of the evidence because: (a) Arpac had no protectable proprietary interest in its customers and would suffer no irreparable harm; and (b) the order was overly broad due to the court's determination that "end users" were Arpac's customers; (2) whether the restrictions contained in Murray's employment agreement were overly broad, thus rendering the restrictive covenant void; and (3) whether the circuit court erred in holding that Murray's employment agreement was authorized by and binding upon Arpac.

Arpac, operating in the Chicago area since 1971, manufactures shrink-wrap packaging machinery, which is used to package products by surrounding them with a plastic film, heated until it contracts to tightly enclose the products. Shrink-wrap packaging machines are typ-

ically used at the end of a manufacturer's assembly line for packaging multiple products, including foods, beverages, and pharmaceuticals. In addition to its nationwide sales, Arpac sells its shrink-wrap machines in foreign countries.

Arpac's sales of its machinery are either to distributors, who then sell the machinery to others at a higher price, or "end users," large companies who purchase either directly from Arpac or from the distributors for their own account. By 1990, Arpac's sales to distributors comprised 80% to 85% of its total sales, with the balance of sales to end users. Of those distributors, the top 30 to 40 have had an association with Arpac from 3 years to 10 or more years, the average association being five years. Because of the complexity of choosing the proper machinery, it may take from six months to five years from the time a quote is first received until the machinery is installed at the customer's work place. During that time, Arpac and its distributors determine, in cooperation with the customer, the type of features suitable to that customer's uses. The shrink-wrap packaging business in the United States, in which Arpac competes, consists of Arpac and 8 to 10 other manufacturers of machinery, and comprises less than 1% of the total packaging industry.

In 1987, Murray, a South African national, met Michael Levy, also from South Africa, and advised him of his desire to leave South Africa and obtain employment in America, Australia, or Europe. Levy, who at the time had been in the shrink-wrap business since 1965, was considering purchasing Arpac. The two men discussed the possibility of Murray's working for Arpac as its marketing vice-president.

At the time of their meeting, Murray held the equivalent of a college diploma in chemical technology from the Witwatersrand Technical College in Johannesburg, South Africa. Although he had extensive experience as a salesman in the packaging industry in South Africa and Europe, Murray was not in the business of manufacturing or selling shrink-wrap machinery nor was he familiar with shrink-wrap packaging machines or their operation.

While still in South Africa, during his acquisition of Arpac, Levy presented Murray with an employment agreement, offering him a position with Arpac. The agreement, which included a restrictive covenant, provided that Murray would work for Arpac for a three-year period; the agreement allowed Murray to terminate his employment without cause, but prohibited Arpac from terminating Murray's employment, except for cause. Additionally, the agreement granted Murray an option to purchase Arpac's common stock, an option Murray never exercised. During negotiations, Murray's attorney reviewed the

agreement and suggested to him that it was unenforceable according to South African law. Although Murray believed that the restrictive covenant was unenforceable, he never suggested that to Levy. Further, Murray, while negotiating the employment agreement, never attempted to modify or delete the restrictive covenant.

The covenant provided, in pertinent part, that:

"Murray acknowledges that Arpac's relationships with its customers, their affiliates and related entities, and their employees and former persons, hereinafter referred to as prohibited persons, are special and unique, and that Arpac's relationship with the prohibited persons may not be able to be replaced by Arpac. Murray further acknowledges that the protection of Arpac's customers and business is essential. Therefore, Murray expressly covenants and agrees that during the term of his employment by Arpac and for a period of twenty-four (24) months immediately following the expiration or termination of such employment for any reason *** he will not at any time for himself or on behalf of any other person, firm, partnership or corporation engage in the business (or any part thereof) of manufacturing, producing, marketing or selling shrink-packaging machinery in the United States, (other than the states of Wyoming, Montana, Hawaii and Alaska). Further, Murray expressly covenants and agrees that during the term of his employment by Arpac and for a period of twenty-four (24) months immediately following the expiration or termination of such employment for any reason *** he will not at any time induce, or attempt to induce, any customer of Arpac to whom goods have been sold in the preceding five (5) years to refrain from purchasing the same or similar goods from Arpac or to cancel or fail to renew any contract with Arpac; or solicit the business of such customers directly or indirectly for his own account or for the account of any other person, firm, partnership or corporation; or induce, or attempt to induce, any employees, agents or sales personnel of Arpac to terminate any relationship with Arpac."

Thus, at the end of the three-year term of employment or whenever Murray left Arpac, he would become bound for a period of two years thereafter not to engage in any way in the shrink-wrap business in any States other than Montana, Wyoming, Alaska, and Hawaii; to refrain from soliciting any customer who had purchased shrink-wrap equipment from Arpac in the five-year period preceding the date of termination of employment; and to refrain from inducing any employee of Arpac to leave employment with Arpac.

On November 23, 1987, Murray signed the employment agreement, which provided that Murray's employment would begin on such date as Murray submitted to Arpac competent evidence that he was authorized by the United States Immigration and Naturalization Service to be employed in the United States.

After Murray obtained his visa, he moved to the United States and began working for Arpac. For approximately the first three months of his employment, he was the chief executive officer of Arpac in Levy's absence. Thereafter, Murray became vice-president of marketing and sales. His responsibility was to take all actions necessary to market Arpac's products, including "fostering" the network of Arpac distributors, conducting sales conferences, sending out newsletters, setting up training sessions for customers and distributors, exhibiting Arpac's machinery at trade shows, preparing manuals for Arpac's sales staff, establishing an award system for Arpac's distributors, visiting customers, and maintaining phone and personal contact with all Arpac distributors. Moreover, both he and Levy worked together to increase customer loyalty to Arpac. Although, prior to his employment at Arpac, Murray was unfamiliar with the shrink-wrap industry and did not know a single Arpac customer, once hired by Arpac, he made it a practice to visit each Arpac distributor personally at least once every three months.

Shortly before his three-year term of employment was due to expire, Murray began discussions with Hans Deubel, the president of H & K Holding Company (H&K) in Waukesha, Wisconsin, about the possibility of working for that company selling various types of packaging equipment other than shrink-wrap machinery. On December 14, 1990, Murray resigned from Arpac and on January 2, 1991, began employment with BMI, a corporation formed on that date as a subsidiary of H&K. BMI was incorporated for the specific purpose of selling shrink-wrap packaging machinery and Murray was designated as its president and sales manager.

Not long after Murray left Arpac, three other Arpac employees left: Elvezio Martelli, Arpac's senior salesman for 10 years, left Arpac on February 10, 1991; Branko Vukotic, Arpac's production manager, left on January 18, 1991; and Bogomil Ignatov, Arpac's electrical foreman for 13 years, left on March 1, 1991.

On March 25, 1991, Arpac brought suit for injunctive and other relief against Murray, BMI, Martelli, Vukotic, and Ignatov, claiming that Murray, in violation of the restrictive covenant in his employment agreement, engaged in competition with Arpac, solicited its customers, and enticed away its employees. Arpac averred that BMI had

improperly acquired, through Murray, confidential information belonging to Arpac. Arpac further alleged that Martelli, though not subject to an employment agreement, had nevertheless engaged in unfair competition with Arpac. Finally, Arpac claimed that Vukotic and Ignatov terminated their employment allegedly as a result of a conspiracy with Murray and Martelli.

Thereafter, the circuit court entered findings in favor of Vukotic and Ignatov. Following a hearing, the court, in slightly modifying the restrictive covenant, enjoined Murray and BMI from soliciting any of Arpac's customers of the previous five years for a period of 24 months; enjoined Murray from competing with Arpac in the shrink-wrap business in all but four States; and enjoined Murray from inducing Arpac's employees to leave their positions with Arpac. The circuit court found that Arpac's relationship with its customers was unique and that, but for his employment with Arpac, Murray would have had no opportunity to develop relationships with Arpac's customers. Further, the court found that, although the restrictive covenant was essentially nationwide, the nonsolicitation covenant was enforceable because Arpac had a proprietary interest in its customers. Likewise, the court found that the covenant's restriction on Murray from competing in the shrink-wrap industry was reasonable and thus enforceable.[1] The court declined, however, to enjoin Murray from disclosing information obtained while employed by Arpac, because the court found that that information lacked the requisite confidentiality.

Murray appeals from the court's order enjoining him from competing with Arpac in the shrink-wrap business, from soliciting any of Arpac's customers of the previous five years for a period of 24 months, and from inducing Arpac's employees to quit.

## I

Murray initially contends that the injunction entered against him should be set aside because the granting of injunctive relief was against the manifest weight of the evidence. Specifically, Murray maintains that the circuit court erred in finding that Arpac had a pro-

---

[1]The circuit court initially ruled that the restriction against Murray working in any capacity in the shrink-wrap business in the United States other than four States was overly broad and thus void. The court, however, later revised its decision on this point pursuant to *The Instrumentalist Co. v. Band, Inc.* (1985), 134 Ill. App. 3d 884, 480 N.E.2d 1273, and directed that the injunction issue against Murray working in the shrink-wrap business anywhere in the United States except Hawaii, Alaska, Wyoming, and Montana.

tectable proprietary interest in its customers, that Arpac would suffer irreparable harm, and that Arpac's end users were customers.

A preliminary injunction is a provisional remedy granted to preserve the status quo, pending a hearing on the case on the merits. (*The Instrumentalist Co. v. Band, Inc.* (1985), 134 Ill. App. 3d 884, 480 N.E.2d 1273.) A party seeking injunctive relief must thus establish that it has a clear right which ought to be protected; that it is likely to succeed on the merits; that there is no adequate remedy at law; and that irreparable harm will occur if the injunction is not granted. (*Millard Maintenance Service Co. v. Bernero* (1990), 207 Ill. App. 3d 736, 743, 566 N.E.2d 379; *Preferred Meal Systems, Inc. v. Guse* (1990), 199 Ill. App. 3d 710, 718, 557 N.E.2d 506; *Agrimerica, Inc. v. Mathes* (1988), 170 Ill. App. 3d 1025, 1031, 524 N.E.2d 947; *A.B. Dick Co. v. American Pro-Tech* (1987), 159 Ill. App. 3d 786, 791, 514 N.E.2d 45.) In order to show a likelihood of success on the merits, however, a party need raise only a fair question as to the existence of the right claimed. *McRand, Inc. v. Van Beelen* (1985), 138 Ill. App. 3d 1045, 1050, 486 N.E.2d 1306; *Wessel Co. v. Busa* (1975), 28 Ill. App. 3d 686, 329 N.E.2d 414.

The decision to grant or deny preliminary injunctive relief rests within the sound discretion of the circuit court and will not be disturbed absent a showing of abuse. (*A.B. Dick Co.*, 159 Ill. App. 3d at 791; *McRand, Inc.*, 138 Ill. App. 3d at 1050.) The role of a reviewing court, therefore, is limited to examining the issues on their merits only insofar as is necessary to determine whether the circuit court's findings are contrary to the manifest weight of the evidence. (*Millard Maintenance Service Co.*, 207 Ill. App. 3d at 743-44; *McRand, Inc.*, 138 Ill. App. 3d at 1050-51.) Whether injunctive relief should have been granted under the facts of the instant case depends upon the existence of an interest subject to protection and the enforceability of the restrictive covenant. *Millard Maintenance Service Co.*, 207 Ill. App. 3d at 744; *Agrimerica, Inc.*, 170 Ill. App. 3d at 1031; *A.B. Dick Co.*, 159 Ill. App. 3d at 792.

## A

■ Murray contends that Arpac is not entitled to injunctive relief because it failed to establish the existence of a protectable business interest in its customers. Although it is true that ordinarily an employer has no proprietary interest in its clients (*Corroon & Black of Illinois, Inc. v. Magner* (1986), 145 Ill. App. 3d 151, 163, 494 N.E.2d 785), there are two general situations in which such an interest may be found for purposes of enforcing a covenant not to compete: where,

by the nature of the business, an employer has a near-permanent relationship with its customers and, but for his association with his employer, an employee would have had no contact with them; or where the former employee learns trade secrets or acquires other confidential information during his employment and subsequently attempts to use it for his own benefit. (*Label Printers v. Pflug* (1991), 206 Ill. App. 3d 483, 491, 564 N.E.2d 1382; *Reinhardt Printing Co. v. Feld* (1986), 142 Ill. App. 3d 9, 15-16, 490 N.E.2d 1302.) The first situation applies to the case at bar.

■ Several objective factors are considered in determining whether a near-permanent relationship exists between an employer and its customers: the time, cost, and difficulty involved in developing and maintaining the clients; the parties' intention to remain affiliated indefinitely; and the continuity as well as the duration of the relationship. (*Reinhardt Printing Co.*, 142 Ill. App. 3d at 15; *McRand, Inc.*, 138 Ill. App. 3d at 1051-53.) Thus, the number of years it takes the employer to develop the clientele indicates the parties' intention to remain affiliated for an indefinite period. (*McRand, Inc.*, 138 Ill. App. 3d at 1051.) The amount of money invested in developing the client base is also an objective indication of the employer's intention to retain the customer relationship in a near-permanent status. (*McRand, Inc.*, 138 Ill. App. 3d at 1052.) Correspondingly, an indication of the employer's intention to retain the customer relationship permanently is the difficulty involved in the process of developing the clientele. (*McRand, Inc.*, 138 Ill. App. 3d at 1052.) Conversely, no such protectable interest is recognized where the employer-customer relationship is short-term and no specialized knowledge has been acquired by or imparted to the employee. *Reinhardt Printing Co.*, 142 Ill. App. 3d at 15.

■ In the instant case, the testimony at the hearing established that Arpac strongly relies upon its solid base of customers. Because of the importance of maintaining its long-term customers, Arpac spends an "absolute fortune" on developing its clientele and maintaining the loyalty of its customers. Not only does Arpac spend time and money on training programs, trade shows, and the education of its distributors, but it ensures that its employees maintain the necessary personal contact with its customers. Charles Sgro, vice-president of one of Arpac's largest distributors, testified that he considers Arpac a "partner," and his company and Arpac operate with each other's long-term interests in mind. Likewise, several of Arpac's distributors have had an association with Arpac in excess of 10 years, the average association being five years.

Although Murray attempts to diminish Arpac's relationship with its customers by arguing that they occasionally do business with shrink-wrap machine manufacturers other than Arpac, this fact alone does not lessen the permanency of their relationship with Arpac. (See, e.g., *Charles P. Young Co. v. Leuser* (1985), 137 Ill. App. 3d 1044, 485 N.E.2d 541.) Further, Murray's contention that it was through his own efforts alone that Arpac's customer base increased has no basis in the record. What the record does indicate, though, is that Arpac manufactures sophisticated, expensive machinery, which requires a great deal of time and expense to market; thus, Arpac depends upon the loyalty of its customers, both distributors and end users, to effectuate its sales. Accordingly, we find that the circuit court's determination that Arpac's relationship with its customers is near-permanent was not contrary to the manifest weight of the evidence.

■ The second part of the test which determines whether a protectable interest exists in customer relationships is whether, but for the job with the employer, the employee would not have come into contact with the customers. (*Agrimerica, Inc.*, 170 Ill. App. 3d at 1033; *Corroon & Black of Illinois, Inc.*, 145 Ill. App. 3d at 163.) Here, Murray had had no contact with any of Arpac's customers prior to his employment with Arpac. Further, it is highly unlikely that Murray, a South African national who had never worked in the shrink-wrap industry prior to working for Arpac, would have developed relationships with Arpac's customers were it not for his association with Arpac.

Once a protectable interest is established, irreparable injury is presumed to ensue if the interest is not protected. (*McRand, Inc.*, 138 Ill. App. 3d at 1055; *Donald McElroy, Inc. v. Delaney* (1979), 72 Ill. App. 3d 285, 389 N.E.2d 1300.) In the present case, immediately after leaving Arpac, Murray, with the cooperation of H&K, set up a corporation, the sole purpose of which was to compete with Arpac. Murray's assertion that Arpac did not show the possibility of irreparable injury must thus fail.

Accordingly, we conclude that the circuit court did not err in finding that Arpac had a protectable proprietary interest in its customers.

### B

Murray also contends that the circuit court's order was against the manifest weight of the evidence because the court included end users who did not purchase machinery directly from Arpac, but instead purchased the equipment from distributors, in the definition of customers for purposes of the injunction. Specifically, he maintains that, because Arpac does not have as much contact with end users as

it has with distributors, such inclusion renders the injunction overly broad.

The circuit court in the instant case, notwithstanding Murray's contention, based its ruling that end users who purchased through distributors are customers of Arpac on the "evidence in the record that [Arpac], regardless of whether or not [its machinery] was sold through a distributor, brings in the end user, has a dry run of the machine, [and] answers the calls directly in terms of servicing." In other words, Arpac works closely with the end users and depends on their loyalty and goodwill.

■ Because the record does indeed reflect that Arpac has continued contact with end users who purchase shrink-wrap machines, whether from distributors or directly from Arpac, it does not appear that the circuit court erred in holding that both end users who purchase from distributors and those who purchase directly from Arpac are customers for purposes of the injunction.

## II

Having identified an interest amenable to protection, we next consider Murray's contention that the restrictive covenant in his employment agreement is overly broad and thus void. Murray maintains that rather than placing reasonable restrictions upon him, Arpac has sought to eliminate a potential competitor.

Enforceability of a restrictive covenant in an employment contract is dependent on whether, given the particular facts of the case, the restraints imposed thereby are reasonably necessary for the protection of the employer's business from unfair or improper competition. (*Reinhardt Printing Co.*, 142 Ill. App. 3d at 15; *The Instrumentalist Co.*, 134 Ill. App. 3d 884, 480 N.E.2d 1273.) A restrictive covenant's reasonableness is measured by its hardship to the employee, its effect upon the general public, and the reasonableness of the time, territory, and activity restrictions. (*Millard Maintenance Service Co.*, 207 Ill. App. 3d at 749-50; *McRand, Inc.*, 138 Ill. App. 3d at 1056-57.) "A restrictive covenant in an employment agreement is generally held to be enforceable if it is reasonable in geographical and temporal scope and it is necessary to protect a legitimate business interest of the employer." (*Shapiro v. Regent Printing Co.* (1989), 192 Ill. App. 3d 1005, 1010, 549 N.E.2d 793.) The question is one of law and because covenants operate as partial restraints of trade, they are scrutinized carefully by the courts. (*Reinhardt Printing Co.*, 142 Ill. App. 3d at 15.) A restrictive covenant may be held enforceable only if the time and geographical limitations are reasonable and the restrictions are rea-

sonably necessary to protect a legitimate business interest of the employer, a determination which necessarily turns on the facts of the case. *Reinhardt Printing Co.*, 142 Ill. App. 3d at 15; *The Instrumentalist Co.*, 134 Ill. App. 3d 884, 480 N.E.2d 1273.

■ Here, that portion of the restrictive covenant preventing Murray from soliciting Arpac's customers of the previous five years is clearly an "activity" covenant, designed not to restrict competition, but rather to protect Arpac's relationship with its customers. Such covenants do not require geographic limitations, but must be reasonably related to the employer's interest in protecting customer relations that its employees developed while working for the employer. (*Agrimerica, Inc.*, 170 Ill. App. 3d at 1034; *Corroon & Black of Illinois, Inc.*, 145 Ill. App. 3d at 165.) In the instant case, the covenant restricts nonsolicitation to only those customers which have had business dealings with Arpac in the previous five years. Because of the nature of the industry and the time involved in the manufacture and marketing of the machinery, the five-year span is not unreasonable; on the average, Arpac's larger customers have had a five-year relationship with the manufacturer. Further, as noted earlier, such a nonsolicitation covenant is reasonable in order to protect Arpac's interest in its customers.

Murray further contends that the covenant's restriction prohibiting him from "inducing" Arpac's employees to quit provides no discernible benefit or protection to Arpac and, thus, is void and unenforceable. In response, Arpac maintains that, based upon the evidence adduced at the hearing, the covenant was necessary to protect its legitimate business interests and maintain a stable work force. Arpac asserts that those interests clearly needed protection in light of Murray's attempts to induce several Arpac employees to leave the company.

The circuit court in the instant case enforced that part of the covenant prohibiting Murray from inducing Arpac employees to quit because it found that two Arpac employees quitting at approximately the same time that Murray left to be more than a coincidence. As the court stated, Murray's telephone records prior to his leaving Arpac reflected no calls to either Vukotic or to Ignatov; however, during the two months subsequent to his resignation, a "flurry of activity" took place between Murray's phone and those of Vukotic and Ignatov.

Because it appears that the covenant restricting the solicitation of Arpac's employees was reasonably calculated to protect Arpac's interest in maintaining a stable work force, we find that this portion of the restrictive covenant was enforceable and not void. See also *Torrence*

*v. Hewitt Associates* (1986), 143 Ill. App. 3d 520, 493 N.E.2d 74; *Frank B. Hall & Co. v. Payseur* (1979), 78 Ill. App. 3d 230, 396 N.E.2d 1246.

Murray also asserts, however, that the time and geographical restraints of the covenant are unreasonable because, he maintains, they prohibit him, for a period of two years, from working for any company in the world which competes with Arpac in the United States. He contends that the noncompetition restriction, preventing him from working in the shrink-wrap business in any capacity in all but four States, was not designed to protect any legitimate business interest of Arpac, but rather to prevent competition *per se* and is thus contrary to public policy and unenforceable.

With respect to the geographic scope of noncompetition covenants, courts generally look to whether the restricted area is coextensive with the area in which the employer is doing business (*Donald McElroy, Inc.*, 72 Ill. App. 3d 285, 389 N.E.2d 1300), and have upheld as reasonable even those covenants containing no geographical limitation where the employer was doing business nationwide and the purpose of the restriction was to protect the employer from losing customers to a former employee who, by virtue of his prior relationship, gained special knowledge and familiarity with the customers' requirements (*The Instrumentalist Co.*, 134 Ill. App. 3d 884, 480 N.E.2d 1273; *Donald McElroy, Inc.*, 72 Ill. App. 3d 285, 389 N.E.2d 1300; *Wolf & Co. v. Waldron* (1977), 51 Ill. App. 3d 239, 366 N.E.2d 603).

In the case at bar, the circuit court initially found the covenant's restriction upon Murray, preventing him from engaging in the manufacture, production or marketing of shrink-wrap packaging machinery in the United States except for four States, unreasonable and unenforceable. The circuit court found that the noncompetition restriction was essentially nationwide in scope despite its allowance for competition in four noncontiguous States; thus, the court held that, without a geographical limit, the noncompetition restriction was overly broad and not necessary to preserve the goodwill of Arpac. It was only after Arpac offered *The Instrumentalist* for support that the court changed its ruling and held that the noncompetition covenant was enforceable. Murray urges that it was error for the court to rely upon *The Instrumentalist*.

In *The Instrumentalist*, the plaintiff was engaged in the publishing of a trade magazine directed at school band and orchestra directors and music teachers. After being employed by the plaintiff as an editor and advertising manager for approximately 14 years, the defendant voluntarily terminated his employment and, thereafter, be-

came a principal shareholder and editor of another magazine in competition with the plaintiff. The plaintiff attempted to enjoin the defendant from working for the competitor on the basis of its employment agreement with the defendant, which provided that the defendant would, for two years following the termination of his employment, refrain from working for "any other business *** engaged in the business of publishing, selling, or distributing a magazine or other periodical directed to or primarily used by band or orchestra directors, piano or organ teachers or junior or senior high school instrumental musicians in the United States of America." *The Instrumentalist Co.*, 134 Ill. App. 3d at 887.

The defendant in *The Instrumentalist* argued, as Murray has in the instant case, that the foregoing restriction in the covenant prevented him from working for any company which competed with the plaintiff in the entire United States and, thus, was void and unenforceable. The court, however, disregarded the defendant's assertion and held that the noncompetition restriction was reasonable and enforceable, despite its lack of geographical boundaries, in order to protect the plaintiff from the loss of its customers to the defendant by reason of his long-term relationship with it and the knowledge he gained as editor and advertising manager. (*The Instrumentalist Co.*, 134 Ill. App. 3d at 895-96.) In so holding, the court placed emphasis on the fact that the restricted area of business, namely the school band music area, comprised only a small portion of the entire music publishing area. (*The Instrumentalist Co.*, 134 Ill. App. 3d at 895-96.) Thus, the court reasoned, the defendant was free to accept employment with any music magazine, whether as an editor or advertising manager, or both, or even to publish his own magazine so long as any such publication was outside the specific prohibitions of the covenant. *The Instrumentalist Co.*, 134 Ill. App. 3d at 896.

Similarly, in the instant case, the restriction, according to Murray, prevents him from competing virtually in any market worldwide. He argues that, even if Arpac does have a protectable interest in its customers or confidential information, the restraint on competition is unreasonable both in terms of its effect on the general public and its effect on Murray's ability to gain employment.

In response, Arpac contends that the restriction prevents Murray from working only in a small segment of the packaging industry in which he has experience; Arpac points out that the shrink-wrap industry comprises only 1% of the packaging industry. Arpac asserts that the circuit court was correct when it found that "Murray can go out and he can compete with all the world in terms of the packaging busi-

ness, which incidentally he has a substantial background in. All that this order will do is prohibit him from competing for two years nationwide in one percent of the packaging business which constitutes the shrink-wrap machine business."

It is apparent that the employment agreement here is very broad. In addition to prohibiting Murray from soliciting Arpac's customers, it prevents him from engaging in the shrink-wrap business in any capacity, whether manufacturing, producing, marketing, or selling, anywhere in the United States except for four noncontiguous States. Because the validity of a contract in restraint of competition is determined by its reasonableness in terms of its effect on the parties and the public (*House of Vision, Inc. v. Hiyane* (1967), 37 Ill. 2d 32, 39, 225 N.E.2d 21), we find that the portion of the agreement prohibiting Murray from working in any capacity in the shrink-wrap business is patently unfair. Certainly an employment contract is reasonable if its enforcement will not be injurious to the public, not cause undue hardship to the promisor, and is not greater than is necessary to protect the employer (*Dryvit System, Inc. v. Rushing* (1985), 132 Ill. App. 3d 9, 477 N.E.2d 35); however, we find that, here, the virtually unlimited geographic restraints on competitive activities and the further restriction from association with any company whose activities involve competition in the shrink-wrap industry are clearly beyond the need of Arpac to protect its interest and are unduly harsh on Murray. Moreover, Arpac's concern for the protection of its customers, one reason *The Instrumentalist* court enforced that plaintiff's agreement, is adequately addressed in the case at bar by the nonsolicitation clause of Murray's employment agreement.

Despite Arpac's assertion that *The Instrumentalist* is controlling, we find that the noncompetition portion of the agreement in the instant case, unlike that in *The Instrumentalist*, does not serve to protect Arpac's interest in its customers, but rather, exists only to stifle any competition Murray might offer to Arpac. As such, the noncompetition portion of the agreement is unjust and void as against public policy. See, *e.g., Hamer Holding Group, Inc. v. Elmore* (1990), 202 Ill. App. 3d 994, 560 N.E.2d 907.

Murray contends that it is error for the circuit court or this court to modify the restrictive covenant. Specifically, Murray maintains that the covenant is void and should not be rewritten to conform to a reasonable standard.

Although a circuit court is not prohibited from modifying restraints embodied in an employment contract, the fairness of the restraint initially imposed is a relevant consideration of the court in eq-

uity. (*House of Vision, Inc.*, 37 Ill. 2d at 39; *Stamatakis Industries, Inc. v. King* (1987), 165 Ill. App. 3d 879, 520 N.E.2d 770; *Shorr Paper Products, Inc. v. Frary* (1979), 74 Ill. App. 3d 498, 507, 392 N.E.2d 1148.) The court is not required, however, to follow the terms of the covenant exactly in issuing an injunction. (*McRand, Inc.*, 138 Ill. App. 3d at 1058.) In the instant case, the circuit court modified only slightly the covenant, holding that the balance of the restrictions were reasonable and necessary to protect Arpac's legitimate business interests. Furthermore, we do not find modification inappropriate where, as here, the agreement specifically allows, in a severability clause, a court to modify its limits if its restrictions are too broad. See *Wyatt v. Dishong* (1984), 127 Ill. App. 3d 716, 719, 469 N.E.2d 608; *cf. Hill v. Names & Addresses, Inc.* (1991), 212 Ill. App. 3d 1065, 1088-89, 571 N.E.2d 1085 (employment agreement's covenant not to compete, termed "essential element" of the agreement, in conflict with severability clause).

Accordingly, we affirm the court's order enforcing the non-solicitation restrictions as to Arpac's employees and customers; we reverse, however, the court's order enforcing the noncompetition clause, holding that it is overly broad.

### III

Finally, Murray contends that the employment agreement was neither authorized by nor binding upon Arpac. Specifically, he argues that Levy never had the authority to enter into the employment contract, which offered a stock option to Murray, without prior approval by Arpac's board of directors. Thus, because the contract was never authorized by Arpac's board, Murray contends that it is void. Murray further maintains that the court never considered the issue properly, but rather, mistakenly regarded it as being part of Murray's unclean hands defenses.

In response, Arpac asserts that Murray cannot now raise such an argument because he twice admitted in verified pleadings that he and Arpac entered into a valid employment agreement/stock option agreement. (See *Beverly Bank v. Coleman Air Transport* (1985), 134 Ill. App. 3d 699, 703, 481 N.E.2d 54.) Murray rejoins that his admission was in error; he asserts that only after discovery was it revealed that Levy did not have the authority to enter into the agreement.

Any admission contained in the original verified pleading, which is not the product of mistake or inadvertence, is a binding judicial admission. (*American National Bank & Trust Co. v. Erickson* (1983), 115 Ill. App. 3d 1026, 452 N.E.2d 3.) Correspondingly, such an admis-

sion has the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact. *Beverly Bank*, 134 Ill. App. 3d at 703.

Here, Murray contends that his admission was error because the information necessary to respond was unavailable. However, he has offered little support for his contention, other than arguing that his admission was inadvertent. Thus, based upon the record and the support provided by Murray, we find that Murray's verified answer admitting Arpac's allegation that an employment agreement had been entered into between Arpac and him constituted a binding judicial admission against Murray.

In summary, we conclude that the circuit court's findings—that for purposes of preliminary injunctive relief, the evidence was sufficient to demonstrate that Arpac possesses a legitimate business interest in need of protection; that there is no adequate remedy at law; that injury to Arpac will result if the covenant is not enforced; and that the benefits in granting the injunctive relief sought by Arpac outweigh the injury which Murray might suffer thereby—are supported by the evidence presented. Consequently, we find no abuse of discretion by the circuit court in entering the preliminary injunction. Although we find that the court properly held that the nonsolicitation portions of the covenant were enforceable, we find that that portion of the covenant restricting Murray from engaging in the shrink-wrap business in any State except four, is unconscionable, unreasonable, overbroad in its application, and constitutes an unlawful restraint of trade insofar as it would restrict Murray's employment. We thus reverse the circuit court's order enforcing the noncompetition restriction in the covenant.

For the foregoing reasons, the order of the circuit court of Cook County is affirmed in part and reversed in part.

Affirmed in part and reversed in part.

HARTMAN, P.J., and SCARIANO, J., concur.