2021 IL App (1st) 200684-U

No. 1-20-0684

Order filed March 26, 2021

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| TIM HINCHMAN, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Counter-Defendant-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 CH 12929 |
| | ) | |
| BRIAN PHEBUS, an Illinois Resident, and METRO | ) | Honorable |
| EXHIBIT CORPORATION, an Illinois corporation, | ) | Pamela McLean Meyerson, |
| | ) | Judge, Presiding. |
| Defendants-Counter-Plaintiffs-Appellants. | ) | |

JUSTICE SHARON ODEN JOHNSON delivered the judgment of the court.
Presiding Justice Mikva and Justice Connors concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The circuit court did not abuse its discretion in denying defendants' motion for a preliminary injunction where they failed to establish protectable interests in their customer lists or any other alleged confidential information and where the restrictive covenant was overly broad.

¶ 2    Defendants/Counter-Plaintiffs Brian Phebus (Phebus) and Metro Exhibit Corporation

(Metro) filed this interlocutory appeal pursuant to Illinois Supreme Court Rule 307(a)(1) (Ill. S.

Ct. R. 307(a)(1) (eff. Nov. 1, 2017)) to appeal the denial of their motion for a preliminary

injunction against former employee, Plaintiff/Counter-Defendant Tim Hinchman (Hinchman), on March 11, 2020. On appeal, defendants contend that the circuit court erred when it incorrectly applied the standard from our supreme court's decision in *Reliable Fire Equipment Co. v. Arrendondo*, 2011 IL 111871, by focusing solely on the existence of near permanent customer relationships rather than the totality of the circumstances to determine whether a legitimate protectable interest exists. For the reasons that follow, we affirm.

¶ 3                                                     BACKGROUND

¶ 4    Metro is a trade show exhibit company and Hinchman was a former sales executive for the company.  On November 7, 2019, Hinchman filed a verified complaint against Metro and its CEO, Phebus, in which he sought a declaration that the nondisclosure and noncompete agreement (agreement) had no valid and legal effect (count I) and damages for retaliatory discharge (count II).

¶ 5    On November 14, 2019, Metro filed a verified counter-complaint against Hinchman in which it sought a temporary restraining order (TRO), preliminary injunction and other relief for Hinchman's alleged breach of the agreement (count I) and damages for Hinchman's alleged breach of fiduciary duty to Metro (count II). Metro requested that the circuit court order Hinchman to refrain from soliciting current Metro clients and from directly competing with Metro. The circuit court denied the request for the TRO and the matter was set for hearing on the preliminary injunction motion on November 22, 2019.  The parties later filed a joint statement of facts in the circuit court on February 3, 2020.

¶ 6    According to the joint statement of facts, Metro was a company that designed, fabricated, managed, constructed, assembled, stored, rented, and provided financing solutions to clients

nationwide for trade show exhibitions. Metro had been in business for over 30 years and Phebus was the CEO. Hinchman served as a sales executive for Metro from May 2008 until his termination on October 14, 2019. Hinchman's previous employer was Design Agency, Inc., which also specialized in designing trade show exhibits, and where he received sales training from Tom Bacha (Bacha) during his employment. Hinchman brought no clients to Metro from Design Agency, Inc.

¶ 7    On or about February 1, 2013, the parties entered into an agreement that contained a restrictive covenant against solicitation of Metro's customers. Hinchman was employed by Metro for another six years after the agreement was executed. The parties agreed that the portions of the agreement at issue were as follows:

> "**Paragraph 2.** Employee and the Company further recognize, acknowledge, and agree, that by reason of this Agreement, the Company will:
>
> A. Establish and help to promote contacts and working relationships between Employee and the Company's clients, which is a position of trust and confidence;
>
> B. Expend substantial time, money and effort to train and develop Employee's professional skills and reputation so Employee can better serve the Company's clients;
>
> C. Provide (in confidence and trust) Employee with access to knowledge and confidential information about the Company's and its client's business and financial affairs in order that Employee can professionally serve the Company's client.
>
> * * *

**Paragraph 5.** The Company and Employee recognize, acknowledge, and agree that Employee's services to the Company are special and unique by reason of Employee's access to confidential information belonging to the Company. IN CONSIDERATION OF THE FOREGOING, OF CONTINUED EMPLOYMENT AND PROFESSIONAL ADVANCEMENT WITH THE COMPANY, AS WELL AS OTHER GOOD AND VALUABLE CONSIDERATION, THE SUFFICIENCY OF WHICH CONSIDERATION IS HEREBY ACKNOWLEDGED BY THE PARTIES HERETO, THE EMPLOYEE, IN THE INTERESTS OF EMPLOYER, THE COMPANY AND ITS CLIENTS, SHAREHOLDERS AND OTHER EMPLOYEES, AGREES AS FOLLOWS:

**Paragraph 6:** During Employee's employment with the Company, Employee shall loyally serve its interests of the Company, and the Employee shall under no circumstances:

A. Provide service to sell or work for anyone except the Company without fully and completely disclosing the same to the Company without fully and completely disclosing the same to the Company and obtaining the Company's prior written approval and consent;

B. Provide service to sell or work for any client of the Company's for Employee's own benefit or the benefit of anyone except the Company;

C. Divert, take away or attempt to divert or take away any client, customer or account of the Company or the business of any client, customer, or account of the Company.

**Paragraph 7.  Nondisclosure of Information**

A.  Employee shall hold in confidence and trust for the sole benefit of the Company all knowledge; information and data which Employee obtains or has access to during the course of employment with the Company relating to the business and financial affairs, services, activities and products of the Company or of any person or firm doing business with the Company, such as, but not limited to, master customer lists, client data bases, vendors lists, product specification descriptions, finances, earning, sales volume, sales histories of individual customers, outlets prices, methods, systems, practices, plans, processes and procedures owned, developed or used in the course of business by the Company, all of which, the Employee acknowledges, constitute the valuable property and confidential information of the Company.

B.  Employee shall not disclose, divulge, publish, copy, or reproduce for the benefit of anyone except the Company (without the Company's prior written consent and approval) any of the knowledge, confidential information and data described [i]n Paragraph 7.A above.

C.  Upon termination of employment with the Company (for any reason, and regardless who, initiates such termination), Employee shall not take any original or duplicate books, papers, records, documents, or any other information whatsoever, whether originals or reproductions, made or acquired by Employee or others, which the Employee may obtain during the course of

employment, nor shall the Employee take any knowledge, data and confidential information described in Paragraph 7.A above.

**Paragraph 8. Noncompetition Agreement:**

During the term of Employee's employment with the Company and for two years following the date of Employee's termination of employment the Company (for any reason, and regardless of who initiates such termination), the Employee shall not, directly or indirectly, or by or through any partnership, corporation or entity with which Employee may be associated, do any one or more of the following:

(1) seek to do business with, work for, provide service to, sell to, call upon, cater to, solicit, contact or otherwise deal with any client, person or entity that, at any time during the twelve (12) month period immediately preceding the termination of the Employee's employment, was a customer of the Company except that Employee may provide service to customers otherwise covered by the Agreement under circumstances where (a) Employee has not directly or indirectly solicited, called upon or sought to do busines with the customer or otherwise violated any term or condition of the Agreement, (b) the customer is an existing account of Employee's then current employer, and (c) said employer has required Employee to assist in servicing the customer;

(2) directly or indirectly divert or attempt to divert from the Company any business or customers for which the Employee worked or had knowledge for during the course of employment;

(3) utilize, solicit, influence, attempt to utilize, solicit or influence, or source any of the Company's referrals or referral sources; or

(4) employ, solicit or attempt to employ or solicit for employment any of the Company's employees; induce, persuade or attempt to induce or persuade any of the Company's employees to terminate or modify their employment with the Company or otherwise disrupt, interfere with or attempt to disrupt or interfere with the Company's relationship with any employees.

Without limiting the generality of the foregoing, nothing in subsection (1) above shall prohibit Employee from being employed by a customer of the Company, so long as Employee does not violate any of Employee's other obligations contained in this Agreement.

**Paragraph 9**

**When Employee's relationship with the Company's [sic] terminates (for any reason, and regardless of who initiates such termination), Employee agrees to have a termination interview with the Board of Directors or a person selected by the Board during which there will be a discussion o[f] the restriction contained in this Agreement and at which time the Employee will return all documents, papers and confidential information in Employee's possession, custody or control, as described in the Agreement."**

¶ 8    While employed at Metro, Hinchman worked to develop his reputation as a salesperson. Metro had an online submission form where potential leads could submit a request to Metro for

more information about its services, and Hinchman received leads from the Metro portal. Prior to his termination, Hinchman was Metro's top-grossing salesperson and was often asked to train newer sales executives. Hinchman did not, however, attend sales training for three months. [1] In February 2019, while still employed by Metro, Hinchman formed Primary Exhibit Group, LLC (Primary), to service Jobba Trade Technologies. At the time of the joint statement of facts, Primary was doing business as Atmos Holdings (Atmos). After his termination, Hinchman retained his list of customer prospects and Atmos grew while Metro continued to lose clients.

¶ 9     Subsequently, on February 6, 2020, Metro filed an emergency motion for preliminary injunction against Hinchman, alleging that the scheduled preliminary injunction hearing for February 18, 2020, was unnecessary because its right to the injunction was clear from the facts gained in discovery. The motion noted that the circuit court denied Metro's motion for a TRO because both parties submitted verified pleadings which created a question of fact about whether Metro established a clear right to injunctive relief and the likelihood of success on the merits. Metro asserted that the parties' expedited discovery, inclusive of Hinchman's deposition, and eliminated any factual dispute regarding the enforceability of the Agreement: thus, entitling Metro to injunctive relief and eliminating the need for an evidentiary hearing.

¶ 10    Metro noted that, in his pleadings, Hinchman provided seven reasons why the agreement was unenforceable:  Metro (1) failed to pay all commissions owed upon termination; (2) failed to provide training and development; (3) failed to promote contacts and working relationships with clients; (4) failed to provide access to confidential information; (5) fraudulently induced

_____

[1] The parties did not specify whether the three months occurred prior to Hinchman's termination or prior to the date of the joint statement of facts.

[Hinchman] to enter into the agreement; (6) terminated in retaliation for filing a complaint in human resources; and (7) engaged in fraudulent business practices. Metro argued that while some of those reasons were not defenses to the injunction, none of Hinchman's claims had merit.

¶ 11    Metro further maintained that the uncontested facts, taken from Hinchman's testimony or his documents,[2] were: Hinchman received adequate consideration for the agreement because he was employed an additional six years after he signed it; he was offered training and provided accounts and sales leads; Hinchman was servicing at least seven former customers of Metro; money damages for Metro's lost customers and goodwill were incalculable; harm was incalculable should Hinchman be allowed to continue with his actions; Metro reimbursed Hinchman's expenses for promoting contacts and servicing Metro's customers, totaling $189,180 from 2016 to 2019; Hinchman was given the accounts of former Metro employees; Hinchman had access to Metro's confidential information, including but not limited to customer and show information, that he took with him after his termination; Bacha was a former president of Metro and continued to mentor Hinchman at Atmos; and, Metro paid all commissions due and owing to Hinchman.

¶ 12    Metro argued that it provided sufficient evidence to raise a fair question of the existence of a protectable right and demonstrated a likelihood of success on the merits on its claim for breach of contract. The circuit court disagreed and denied Metro's motion for an emergency preliminary injunction on February 11, 2020.

---

[2] As we have previously set forth the parties' joint statement of facts, we will only detail any new statements of fact as noted in the motion but not listed previously.

¶ 13    An evidentiary hearing was held on February18, 2020, as previously scheduled. Metro called Phebus and Kathy Owens as witnesses, and Hinchman as an adverse witness.  Hinchman also testified in his own behalf and called Bacha as a witness.

¶ 14    After taking the matter under advisement, the circuit court entered a seven-page written memorandum opinion in which it denied Metro's motion for preliminary injunction on March 11, 2020.  In its written opinion, the court began by noting that Metro's prayer for relief was not as broad as the language of the agreement. The circuit court specifically found that the agreement contained broad and extensive restrictive covenants. The court further found that the evidence presented at the hearing showed that the restrictions in the agreement were much broader than necessary to protect Metro's legitimate business interests because the nature of Metro's relationships with its customers could not be characterized as "near permanent." Hinchman testified that, with one exception, Metro had no long-term contracts, which was also supported by Bacha's testimony that Metro had no long-term contracts and that salespeople would "poach clients" at every show. While Phebus testified that Metro had retained some clients for a very long time, including one since 1992, he did not quantify the number of repeat clients and did not contradict the testimony that business was done on a show-by-show basis.

¶ 15    Additionally, the court found that the evidence showed that Hinchman and other salespeople found most of their customers from public sources rather than from any confidential or proprietary information supplied by Metro. Hinchman testified that he obtained the majority of his customers through his own process of gleaning information from show directories and online sources and then contacting past show participants. While acknowledging that he got a few leads from Metro's online web portal, Hinchman testified that they did not result in much business;

neither did the "Exhibitrac" directory supplied by Metro. Bacha testified that Metro marketing personnel created lists from show directories. Phebus testified that various leads were assigned to Hinchman but did not contradict the testimony that the great majority of Hinchman's leads came from public sources. The court concluded that, as a result, Metro did not show that it had a protectable interest in its customers.

¶ 16    Moreover, the circuit court found that the agreement contained an overbroad restriction for the type of work Hinchman could do after leaving Metro – he could not "seek to or do business with, work for, provide service to, call upon, cater to, solicit, contact or otherwise deal with" certain Metro customers. The court found that this attempted to prohibit Hinchman from working for those customers in any capacity, even as a janitor, and restrictions on an employee's post-termination work must be narrowly tailored to protect only against activities that threaten the employer's interest.

¶ 17    The court noted that Metro's prayer for relief in its motion asked the court to order Hinchman only to "refrain from soliciting current [Metro] clients and from directly competing with [Metro]," which essentially asked for reformation of the agreement. However, the court concluded that even the narrowed request was problematic given Metro's failure to show a protectable interest in its clients, and that the court would be reluctant to reform the agreement to conform to Metro's narrowed request for relief as public policy disfavored such reformation. Thus, the circuit court concluded that 1) the agreement was unenforceable as a matter of law; 2) Metro did not show a clearly ascertainable right in need of protection; and 3) Metro did not show a likelihood of success on the merits because Metro did not raise a fair question of the existence of the right claimed. In light of the aforementioned, the court declined to address the elements of

irreparable injury or inadequacy of a remedy at law, and denied Metro's motion for preliminary injunction on March 11, 2020.

¶ 18    Metro filed its notice of interlocutory appeal on May 11, 2020. Ordinarily the notice of appeal would have been due within 30 days of the date of entry of the order being appealed, however, on March 17, 2020 our supreme court issued M.R. 30370, which extended the deadline to file a notice of appeal from 30 days to 60 days. Therefore, Metro's notice of appeal is timely.

¶ 19                                    DISCUSSION

¶ 20                         A.  Metro's Arguments on Appeal

¶ 21    On appeal, Metro contends that the circuit court erred by incorrectly applying the reasonableness standard from the supreme court's decision in *Reliable Fire Equipment Co. v. Arrendondo*, 2011 IL 111871, by focusing only on the existence of near permanent customer relationships rather than the totality of the circumstances when determining whether a legitimate protectable interest exists.    Metro argues that it has protectable interests in its confidential information, customer relationships and goodwill, which the circuit court failed to consider.

¶ 22    Metro asserts that it has been in business for 30 years and that it had long-term client and personal relationships with its customers sufficient to satisfy the requirement of near permanent relationships.    According to Metro, it has spent more than $450,000 since 2011 on marketing efforts, including the purchase of specific trade show directories, such as Exhibitrac, that changed from show to show and year to year.  It also paid expenses for sales executives to entertain clients and potential clients.  Metro additionally contends that it satisfies the nature of the business test because it provides a unique product to its customers, namely designing and assembling trade show

exhibits based on the customer's budget and desires for the exhibit. Thus, Metro also argues that its pricing data, policies and procedures, client sales history are all confidential.

¶ 23    With respect to the circuit court's interpretation of the agreement, Metro contends that the court erred; first arguing that the agreement is more accurately characterized as a non-solicit agreement and was not overbroad. Second, the duration and geographic scope of the agreement is reasonable because the evidence demonstrated that the customers were located nationwide. Third, the circuit court did not apply the "blue pencil" doctrine used in *Arpac Corp. v. Murray*, 226 Ill. App. 3d 65 (1992) to sever the unenforceable provisions of an agreement and help it comply with Illinois law.

¶ 24    Finally, Metro contends that Hinchman's "consistent untruthfulness calls his testimony during the hearing into doubt," noting what it deems to be several untrue statements that Hinchman made during his deposition and the preliminary injunction hearing. The four statements concern whether certain information or training was provided by Metro, whether all commission due was paid by Metro when Hinchman was terminated, and whether Hinchman was assaulted in the workplace by Phebus. All of which, Metro asserts, reflects on Hinchman's credibility. Based on the aforementioned contentions, Metro ultimately concludes that it satisfied all the elements required for injunctive relief.

¶ 25                                    B. Standard of Review

¶ 26    The ultimate issue in this case is whether the circuit court erred in denying the preliminary injunction. A preliminary injunction is an extraordinary remedy that is designed to preserve the status quo until the merits of the case are decided. *Clinton Landfill, Inc. v. Mahomet Valley Water Authority*, 406 Ill. App. 3d 374, 378 (2010). For the court to issue a preliminary

injunction, the movant must demonstrate that: "(1) it possesses a clear right or interest needing protection, (2) no adequate remedy at law exists, (3) irreparable harm will result if an injunction is not granted, and (4) there is a likelihood of success on the merits of the case." *Gastroenterology Consultants of North Shore, S.C. v. Meiselman¸* 2013 IL App (1st) 123692, ¶ 8. To obtain injunctive relief the movant must raise a fair question that each of these elements is satisfied. *Roxana Community Unit School District No. 1 v. WRB Refining, LP*, 2012 IL App (4th) 120331, ¶ 23. The grant or denial of a preliminary injunction is reviewed for an abuse of discretion. *Gastroenterology Consultants*, 2013 IL App (1st) 123692, ¶ 9.

¶ 27 In this case, however, the circuit court's denial of injunctive relief was primarily predicated on its findings that: 1) the restrictive covenant was unreasonable because it was overbroad and 2) Metro had not established a protectable business interest. Whether a restrictive covenant is enforceable, and whether a protectable interest exists, are matters of law, which we review *de novo*. *AssuredPartners, Inc. v. Schmitt*, 2015 IL App (1st) 141863, ¶ 30.

¶ 28 Illinois courts carefully examine postemployment restrictive covenants because they operate as partial restrictions on trade. *Cambridge Engineering, Inc. v. Mercury Partners 90 BI, Inc.,* 378 Ill. App. 3d 437, 447 (2007). A restrictive covenant, assuming it is ancillary to a valid employment relationship, is reasonable only if the covenant: (1) is no greater than is required for the protection of a legitimate business interest of the employer-promisee, (2) does not impose undue hardship on the employee-promisor, and (3) is not injurious to the public. *Reliable Fire Equipment Co. v. Arrendondo*, 2011 IL 111871, ¶ 17. The protection of a legitimate business interest is a long-established component in this three-prong rule. *Id.* at ¶ 30. Each case must be decided on its own particular set of facts, and whether a legitimate business interest exists is based

on the totality of the facts and circumstances of the individual case. *Id.* at ¶¶ 42-43. An employer seeking to enforce the restrictive covenant bears the burden of showing that the full extent of the restriction is necessary to protect its legitimate business needs. *Health Professionals, Ltd. v. Johnson*, 339 Ill. App. 3d 1021, 1034 (2003). Factual determinations made by a circuit court sitting without a jury are entitled to great deference and will be disturbed on review only when they are against the manifest weight of the evidence. *Gastroenterology Consultants*, 2013 IL App (1st) 123692, ¶ 13. Accordingly, we will uphold the circuit court's factual finding, that Metro did not have a legitimate business interest that warranted the restrictive covenant, unless it is against the manifest weight of the evidence.

¶ 29                              C. ANALYSIS

¶ 30     In the case at bar, Metro argues that it had protectable interests in its confidential information, customer relationships, and goodwill, which the circuit court failed to consider. Metro also contends that the circuit court erred in finding that the agreement was overbroad, and further that it satisfied all the elements necessary for injunctive relief. We disagree.

¶ 31     Whether the employer has a legitimate business interest in need of protection is based upon the totality of the circumstances of the individual case. Contrary to Metro's assertions, "factors to be considered in this analysis include, but are not limited to, the near-permanence of customer relationships, the employee's acquisition of confidential information through his employment, and the time and place restrictions." *Gastroenterology Consultants*, 2013 IL App (1st) 123692, ¶ 10 (quoting *Reliable Fire Equipment Co.*, 2011 IL 111871, ¶ 43). Metro argues that the circuit court applied an incorrect test in determining whether it possessed a legitimate business interest in need

of protection, the "near-permanent customer relationship test," which was repudiated by the supreme court in *Reliable Fire Equipment.* Again, we disagree.

¶ 32    Our reading of the circuit court's memorandum opinion reflects that it analyzed the question of whether Metro had a legitimate business interest in need of protection based upon the totality of the circumstances in this case. The circuit court initially noted that adequate consideration was received for the agreement, as Hinchman was employed for six years after the agreement was signed. The record also indicates that the court clearly considered several factors in reaching its conclusion that Metro did not have protectable interests in its confidential information and customer relationships.

¶ 33    First, the circuit court considered whether Metro had a near-permanent relationship with the customers being serviced by Hinchman at Atmos. Specifically, the court noted Phebus' testimony that Metro retained some long-term clients but never quantified the number of repeat clients and did not contradict the testimony that business was done on a show-by-show basis. Next, the circuit court considered whether Hinchman misappropriated any confidential information that he acquired while employed by Metro; whether he used that information for his own benefit after his termination; and the relative restrictions contained in the employment agreement, as detailed above. Additionally, the circuit court examined and determined issues such as: 1) how Hinchman and other salespeople found most of their customers from public sources rather than any confidential or proprietary information supplied by Metro, thereby establishing that Metro's customer lists were not confidential information; and 2) how not much business resulted from the

"Exhibitrac"[3] directory supplied by Metro. Based on the evidence presented through the parties' pleadings and at the hearing, the court concluded that Metro did not show that it had a protectable interest in its customers. While the circuit court's memorandum opinion did not indicate that it considered Metro's goodwill, the opinion clearly establishes that the court based the determination of whether Metro established a legitimate business interest in need of protection based upon the totality of the circumstances in this case.

¶ 34    We further note that the evidence also established that prior to his employment with Metro, Hinchman was employed as a salesman for Design Agency, Inc., a company which also designed trade show exhibits and where he received training from Bacha. Metro presented no evidence reflecting that any of Hinchman's knowledge of such customers was first learned while he was employed with Metro, especially given that Hinchman was previously employed in the same capacity for a competitor of Metro. As such, we find that while Metro's customer list may have been helpful in marketing to past and potential trade show customers, Metro did not conclusively establish that such lists were based on any confidential information, represented any long-term business for the company, or were the sole basis for Hinchman's customer base while he was employed with Metro.

¶ 35    Considering the totality of the circumstances presented in this case, we conclude that Metro did not have a protectable business interest in its customers or in its alleged confidential information. Because Metro failed to satisfy the first element necessary for injunctive relief, we need not consider whether it satisfied the other elements, as the failure to establish any one of the

---

[3] The evidence established that "Exhibitrac" was a trade show exhibitor list that Metro purchased each year.

elements requires the denial of the preliminary injunction. *Yellow Cab Co. v. Production Workers Union of Chicago & Vicinity, Local* 707, 92 Ill. App. 3d 355, 356 (1980). Accordingly, the circuit court did not abuse its discretion in denying the preliminary injunction.

¶ 36    We also find that the circuit court properly determined that the covenant contained an overbroad restriction for the type of work that Hinchman could do after Metro.  As noted by the circuit court, Hinchman could not "seek to or do business with, work for, provide service to, sell to, call upon, cater to, solicit, contact or otherwise deal with" certain Metro customers.  Restrictions on an employee's post-termination work must be narrowly tailored to protect only against activities that threaten the employer's interest. *Cambridge Engineering*, 378 Ill. App. 3d at 456.  However, here the provision at issue would effectively prohibit Hinchman from working for those customers in any capacity.  As such, we find that this provision is not sufficiently tailored and extends far beyond the protection of the employer's interest.

¶ 37    While Metro claims that the circuit court, and ultimately this court, could "blue pencil" the agreement to render it enforceable, we decline to do so because that would constitute an impermissible rewriting of the agreement.  See *Terry v. State Farm Mutual Automobile Insurance Co.*, 287 Ill. App. 3d 8, 14 (1997) (it is the function and duty of the reviewing court to construe the contract and not make a new contract under the guise of construction.).  Accordingly, we conclude that the circuit court properly declined Metro's invitation to "blue pencil" the agreement and properly found it to be overbroad.

¶ 38    Thus, finding no proprietary, confidential, or any other protectable interest, we cannot say that Metro has demonstrated a proprietary business interest such as to warrant enforcement of the agreement. Metro has failed to establish any confidential or proprietary information, and therefore

cannot establish the necessity of protecting such information. Therefore, we do not agree with Metro's argument that the circuit court's findings were contrary to the manifest weight of the evidence, and accordingly, affirm.

¶ 39                                         CONCLUSION

¶ 40     For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 41     Affirmed.